## RECONSTRUCTION FINANCE CORP. v. MARTIN DENNIS CO.

### No. 10494.

United States Court of Appeals
Third Circuit.

Argued Nov. 21, 1951.

Decided March 27, 1952.

Charles E. Kenworthey, Pittsburgh, Pa. (William M. Robinson, Joseph G. Robinson, Walter T. McGough, Pittsburgh, Pa., William v. Osborne, Jr., Newark, New Jersey, Harold U. Daniels, Cleveland, Ohio, Reed, Smith, Shaw & McClay, Pittsburgh, Pa., Pitney, Hardin & Ward, Newark, N. J., on the brief), for appellant.

Charles R. L. Hemmersley, New York City (Harold E. Jacobsen, A. Glaser, New York City, on the brief), for respondent.

Before BIGGS, Chief Judge, and McLAUGHLIN and HASTIE, Circuit Judges.

McLAUGHLIN, Circuit Judge.

Reconstruction Finance Corporation (R FC), as the statutory successor of Defense Plant Corporation, recovered a judgment for rent against The Martin Dennis Company from which the latter appeals.

In August 1944, appellant was producing sodium bichromate at its Kearny, New Jersey plant. At that time it entered into an agreement with Defense Plant Corporation (Plancor) whereby it was to construct additional facilities with Defense Plant supplying the funds. The real estate involved, a portion of appellant's Kearny property, was leased by it to Defense Plant which was to have title to the buildings erected and to the property, various machinery, etc., acquired. Defense Plant in turn leased the new facilities, including an option to purchase, to appellant. The rental was fixed at $15.98 for each short ton of sodium bichromate manufactured or furnished by appellant in whole or in part at its Kearny plant. The lease provided " * * * that the date of commencement of rental shall be the date of installation, as determined by RFC, of the Machinery to be provided hereunder or, in any event, not later than the sixtieth (60th) day from the date

of commencement of operation of any of the Machinery to be provided hereunder." It was subject to termination by the parties on ten days notice in the event substantial use of the facilities by The Martin Dennis Company to furnish sodium bichromate for the war effort was no longer required.

By the latter part of August 1945 the new facilities were approximately eighty per cent completed. During that month the war with Japan came to an end, in the sense that actual hostilities ceased. Because of this, on August 28th, appellee ordered all engineering and construction work on the plant stopped immediately. Thereafter the War Production Board advised appellee that the Dennis plant was no longer required to produce materials in short supply because of military or civilian demands and recommended that appellee make appropriate disposition of the plant. Appellant was promptly and properly notified and instructed accordingly. On September 12, 1945 appellant requested appellee to complete the plant and lease it to appellant on a long term basis. Walter L. Pope, an attorney in the Defense Plant Section of appellee, replied to that letter saying he had discussed the matter with R. G. Rhett, Chief of appellee's Office of Surplus Property. He enclosed a suggested form of proposal dictated by Rhett. This called for a five year lease at eight per cent a year of the reproduction cost of land, buildings and other improvements as determined by appellee and twelve per cent of the installed cost to appellee of machinery and equipment. The rent was to be paid monthly in advance. No date for the commencement of the rent was stated. If appellee accepted it was to complete the project, the over-all cost including funds previously authorized not to exceed $1,046,589.

On September 18, 1945 appellant sent Pope a signed duplicate of an offer to lease as suggested by Rhett saying in its forwarding letter, "In this connection and in confirmation of our telephone conversation, it is our understanding that no rental shall become due until the project is completed and turned over to us in operating condition." Pope answered this on September 20, 1945, saying, "This is in reply to your letter of September 18, in which you state that it is your understanding that no rental shall become due until the project is completed and turned over to you in operating condition. That is likewise my understanding." On September 21, 1945 the Board of Directors of appellee approved Rhett's recommendation of tentative approval of the proposal for a peacetime lease and on November 21, 1945 gave final approval of such proposal advising appellant to prepare and submit a lease agreement to Washington for approval. Rhett wrote appellant on December 20, 1945 advising of final approval of the form of the lease by appellee's directors and stating that the lease could not be executed until the facilities had been completed and the property declared surplus. He said that both parties were making every effort to complete the facilities as soon as possible and stated in conclusion, "In the meantime you have our permission to occupy the premises and continue operation and utilization thereof pending the execution of the Lease Agreement."

Appellee was succeeded by War Assets Administration on March 25, 1946 as the Government's agency for the disposal of surplus property. On November 16, 1946 the original Defense Plant Lease was terminated. On December 9, 1946 the Dennis facilities were declared surplus. Work was finally stopped by appellant on the project on March 5, 1947 at which time all but ten dollars of the authorized expenditure of $1,046,589 had been committed to the Dennis plant. Appellant, according to its answer to an interrogatory of appellee, did not complete the plant because "1. The operation proved not to be economical and experiment shows that the process could not be made economically sound without expensive modifications and 2. Lack of funds." Around March 14, 1947 appellant's attorney advised the War Assets Administration that appellant wished to be relieved of its obligations under the peacetime lease saying that Mr. Dennis was sick and that the company was in a very precarious financial situation. War Assets assented to this on June 9, 1947. On September 11, 1947 appellant offered to purchase the facilities for $204,000 from War Assets Administration

and did so on February 16, 1948 for that sum.

Appellant had started production of sodium bichromate using the Defense Plant facilities on August 30, 1945. Under the original lease, that fixed November 1, 1945 as the beginning of the rental period with the first rent payment due the latter part of January 1946. From August 30, 1945 to the termination of the lease on November 16, 1946, the volume of production is not disputed. The amount of rent based on that volume is $56,495.64. The amount of interest calculated from the dates on which the rental became due is $16,346.32. This makes a total sum of $72,841.96. The figures were agreed to be accurate by trial counsel for appellant. The trial court directed a verdict in favor of appellee for that sum on the first count of its complaint.

For the period from December 9, 1946, the date on which the facilities were declared surplus, to June 9, 1947 when War Assets Administration agreed to rescind its peacetime lease authorization the district judge held that there was a binding agreement of lease between the parties and that declaration of the property as surplus eliminated the sole obstacle to its fulfillment. To cover rent for this period the court directed a verdict in favor of appellee in the sum of $44,616.50 which was admittedly the correct amount under the formula of the agreement.

This left two periods unaccounted for: the first, from the date of the expiration of the original lease, November 16, 1946, to the date when the property was declared surplus, December 9, 1946, and the second from June 9, 1947, the date War Assets relieved appellant of its obligation under the letter agreement, to January 26, 1948, the date War Assets accepted accountability from the appellee for the facilities. As to these the court held that for those facilities which were actually used appellee was entitled to reasonable rental value to be determined by the jury after hearing expert testimony on the subject. The jury awarded $45,058.49 which included interest at six per cent from January 26, 1948 to the date of the verdict, March 2, 1951. Less a conceded credit due appellant, the total judgment in favor of the appellee amounted to $156,549.03.

Appellant first of all assumes that there was an agreement whereby rent was waived pending completion of the plant facilities. This method of approach seemingly derives from the fact that the trial judge in granting appellee's motion for direction of verdict on the first count of the complaint which concerned the original lease said: " * * * that no employee of any government agency may act outside the scope of his authority and affect and assume functions which are reserved statutorily for the agency itself, and persons dealing with such an agency are not entitled to rely on these ultra vires acts. And with that situation obtaining it would appear that reliance by the defendant on any such representations would not effect an estoppel."

In its assertion of a waiver agreement, appellant relies chiefly on its letter to Pope of September 18, 1945, Pope's reply of September 20th and Rhett's letter of December 20, 1945. Contrary to its assertion that the only dispute between the parties is regarding authorization of the waiver agreement, the existence of any such agreement is flatly contradicted by appellee. That will be discussed shortly but meanwhile, assuming for the moment that the correspondence does point to Pope or Rhett or both consenting to appellant operating the plant until its final completion without rent obligation, and further assuming that appellee's Board of Directors possessed the power to delegate its authority to deal with the lease, there is no indication that the Board ever authorized or approved waiver of the rent or that there was any consideration for the alleged waiver. The complete record of the Board of Directors' actions in connection with the Dennis plant since August 1945 was in evidence and it is barren of indication that the corporation through its directors or otherwise ever attempted to permit Pope or Rhett to contravene the written contract of lease with its various amendatory agreements. As said in Federal Crop Insurance Corporation v. Merrill, 332 U.S.

380, 384, 68 S.Ct. 1, 3, 92 L.Ed. 10, which appellant admits presents· the law of the case:. "Whatever the form in which the Government functions, anyone entering into an arrangement with the Government takes the risk of having accurately ascertained that he who purports to act for the Government stays within the bounds of his authority." Dennis points to the titles of the positions Pope and Rhett held and the work they did for RFC in an effort to show implied authority on the part of one or both those persons to void essentials in the elaborate Plancor lease to the serious prejudice of RFC. There is no reasonable inference which can be drawn from the record justifying that contention. In Pine River Logging & Improvement Co. v. United States, 186 U.S. 279, 291, 22 S.Ct. 920, 925, 46 L. Ed. 1164, though they had no authority so to do, Government agents permitted the extending of timber contracts both as to the quantity and quality of timber to be cut. The court held that the conduct of the agents did not estop the Government from asserting its right to recover for timber cut beyond the quantity and quality specified in the contracts and that " * * * the defendants cannot take refuge under the consent or acquiescence of the government agent in the disregard of these contracts." To the same effect see Utah Power & Light Co. v. United States, 243 U.S. 389, 409, 37 S.Ct. 387, 61 L.Ed. 791; Farm Security Administration v. Herren, 8 Cir., 165 F.2d 554, certiorari denied 333 U.S. 875, 68 S.Ct. 904, 92 L.Ed. 1151.

■ Pope, who was a witness, testified that he had no authority from any source whatever to waive rent under an existing Plancor (Defense Plant Corporation) lease and that the only one he knew having that authority was appellee's Board of Directors. He said that he never waived any rent under the lease before us or told anybody that the rent was being waived under that lease or otherwise. He explained that his letter of September 20, 1945 had replied to that of appellant's president, Marlatt, which in turn had referred to the proposal for the peacetime lease attached to Marlatt's letter. Marlatt clearly testified that he could not say that he believed that Pope

had authority to waive the rent and despite appellant's contention that Marlatt's evidence is ambiguous regarding his reference to the peacetime lease by his phrase in his letter "in this connection * * *", Marlatt did so state. If his language was really ambiguous as is now urged, his letter to Pope could not have been less so, and that adds strength to Pope's interpretation of it.

Rhett was also a witness. He stated that his " * * * duties were confined to the negotiation for the sale or lease of properties that were surplus or in process of becoming surplus and to submit definite recommendations to the Board of Directors as to any action thereon." And that, he said, was the limit of his authority. As to his letter of December 20, 1945 he testified that it was purely informative of the previous Board action which had been taken during the month just passed.

During the very period within which appellant claims it obtained a waiver of its obligation to pay rent, namely, on October 30, 1945, it executed an additional amendment to the original Defense Plant lease, this one "Amendatory No. 5" which corrected misnumbering of certain paragraphs which had occurred in "Amendatory No. 4" and stated the proper paragraphs at length. One paragraph provided that appellee's money commitment to the project be increased by $126,801 which made a total of $1,046,589. Included also was Paragraph #13 which set out in detail the production rental terms appellant was to pay appellee for the use of the facilities in question. Appellant insists that this was a mere formality but it is impossible to ignore the fact that appellant's reiterated approval of its rental payments under its original lease was given six weeks after the exchange of correspondence between Marlatt and Pope and over a month after appellee's Board of Directors had approved the peacetime lease. Despite all this and despite appellant's protestation that it would not have and could not have undertaken production in September 1945 without valid assurance that rent for the facilities until their completion was being eliminated there was no mention by either of the parties in "Amendatory No. 5" of the rent being waived under the lease.

■ Appellant, assuming a no rent arrangement, contends that appellee acquiesced therein by its failure, over a long period, to demand rent and that this is proof of the authority of Pope and Rhett to make such agreement. On this theory of acquiescence, appellant states that appellee's agents knew it was in production beginning September 1945 and that appellee made no effort to collect rent until after the termination of the lease. This hardly implies existence of a waiver of rent agreement when it is recalled that under the lease there was no rent due until the latter part of January 1946. Samuel E. Ford testified in connection with this phase of the suit. During the critical period he was head of appellee's section which was charged with the responsibility and duty of servicing leases in the Dennis plant area. He had 665 leases under his supervision. He said that appellee's engineers who were in and about the plant reported directly to Washington; that as far as his rent collecting department was concerned he depended upon the lessee to notify him that it was in production; where rent was based on production, in the first instance, he depended on the lessee for figures and said that to check up "we would have had their books audited". He stated that he did not know Dennis was in production until November 27, 1946 and that from then on he made various endeavors, which he detailed at length, to collect the rent due under the lease. Mention by Dennis in a letter to Pope that it was getting "operation moving" and Rhett in a letter referring to continued operation by Dennis cannot be reasonably construed as evidencing acquiescence by appellee in Dennis contravening its written contract.

■ Finally on this branch of the case appellant claims that the doctrine of promissory estoppel is applicable against appellee. At best this doctrine could only apply to the period prior to appellee's demands for rent late in 1946, for thereafter appellant could not seriously maintain that it continued its uneconomical production of sodium in reliance on a promise that no rent would be due from it pending completion of the facilities. It is admitted that the principle is ineffective as to unauthorized acts of a Government agent and as has already been pointed out, no authority was shown in either Pope or Rhett to waive the rent. Pope at most gave his own views in his letter and Rhett made no allusion whatsoever to rent. That sort of evidence is far from the definite statement required to support any estoppel even if authority in Pope or Rhett were to be assumed. Both federal and New Jersey decisions are in accord with this. See City of Chicago v. Joseph, 7 Cir., 95 F.2d 444, certiorari denied 304 U.S. 578, 58 S.Ct. 1049, 82 L.Ed. 1542; Miehle Printing Press & Mfg. Co. v. Publication Corp., 7 Cir., 166 F.2d 615, 618; De Cew v. Union Bag & Paper Corp., D.C.N.J., 57 F. Supp. 388, 403; Stanford v. Lyon, 37 N.J. Eq. 94, 110.

■ Appellant seeking application of the principle of promissory estoppel argues that the gratuitous "promise" of the appellee, as should have been reasonably expected by it, induced action of a definite and substantial character by appellant. Cf. Restatement of Contracts, Section 90. Dennis was not in that kind of a position. It was the one who wished to continue with its operation after the war effort had concluded. It was at appellant's insistence that appellee consented to finance the completion of the facilities. It was appellant, of its own initiative, who went into production August 30, 1945 with a peacetime operation. Appellee had nothing to do with this other than to assist appellant most materially in furnishing the facilities requested. None of the product was designed for Government use directly or indirectly. Most of it actually went to the Dennis branch at Newark, New Jersey, where it was used by appellant.

■ As the doctrine of promissory estoppel requires, it is urged that injustice will result if what appellant calls Reconstruction Finance Corporation's promise is not enforced. The record does not support either the reference to appellee's promise or to the alleged injustice. Regarding the latter it was appellant who stopped the completion of the project after appellee had advanced over a million dollars for its construction. That stoppage, appellant states, was caused by its lack of further funds and by the dis-

appointing results from its process for obtaining sodium bichromate and for which the facilities had been specially constructed under the direction of Dennis. After prolonged negotiations appellant had affirmatively refused to take a long term peacetime lease. Shortly after that refusal and primarily because the new facilities were on its land and "scrambled" among its other property, Dennis was able to purchase those facilities installed at a cost of a million dollars plus for $204,000.

█ Appellant also contends that the determination of reasonable values for the two periods not covered by the original lease or the peacetime agreement was erroneous because the standard of values presented to the jury was incorrect and misleading and because proper standards were excluded.

Appellee's expert who testified to the values of which complaint is made, was George E. Walker, a chemical engineer. He is a graduate of Dartmouth and had post graduate work in engineering at Massachusetts Institute of Technology and Columbia and in public administration, finance and economics at George Washington. He has had wide experience in appraising industrial plants, chemical and allied. He said that during the last five or ten years, apart from those made by his staff, he, himself, had made 150 such appraisals and that he had appraised the leasing value of 75 plants of that type. He has bought and sold the various kinds of equipment found in the Dennis plant. There was no objection to him qualifying as an expert on the reasonable value of the Dennis occupancy.

He used three methods in arriving at his final estimate. The first was to determine the physical value of the property and to derive from that the normal rental value. The second was to consider substitute facilities. The third applied the lease method of calculating the rent on a tonnage basis to the production for the period which was being covered in the appraisal. He averaged the three for his ultimate figure. His estimate under his first method amounted to $46,990. His second figure was $44,704. His third amount was $49,291. Averaging

those gave him $46,995 which represented his estimate, without interest, of the reasonable value of the use and occupation of Dennis during the two periods not covered by the original lease or the letter agreement. For these periods the jury awarded $45,058.49 which included over three years interest at six per cent. It must have determined that a fair rental was approximately $38,185, exclusive of interest.

It is contended that Walker ignored undisputed facts bearing upon value. We find this without merit. Walker's first computation was founded upon the classical formula of depreciation plus interest on the investment. His second theory was that of substitute facilities, not, as claimed by appellant, reproduction costs of those facilities. His last computation took into consideration the special rental arrangements of the original lease which were based on tonnage production.

It is stressed that Walker should have included in his estimate the ability of the facilities to earn a profit. We think that on appellee's conception of the problem and under the unusual circumstances, his estimates were complete without that item. The Dennis facilities were not even the ordinary factory building or manufacturing loft. They constituted appellant's private design for its experimental process for the production of sodium bichromate. The rent to be paid by Dennis under the Defense Plant lease depended solely on whether it went into the manufacture of sodium at all and, if it did, on the quantity it made. It should be noted that appellant's own expert developed the profit factor at length and that the jury had that item for consideration in connection with his opinion of what the fair rental should be for the periods in question.

From our own careful examination of the record in this matter we are satisfied that the trial judge properly directed a verdict in favor of appellee as to the original lease and the letter agreement and that he properly submitted the reasonable amount of the use and occupation periods of the tenancy to the jury for its decision.

The judgment below will be affirmed.