## RECONSTRUCTION FINANCE CORP. v. SHERWOOD DISTILLING CO., to Use of HOFFENBERG.

### No. 6515.

United States Court of Appeals
Fourth Circuit.

Argued Nov. 10, 1952.

Decided Dec. 19, 1952.

David R. Owen, Baltimore, Md. (Semmes, Bowen & Semmes, Baltimore, Md., on the brief), for appellant.

Wilson K. Barnes, Baltimore, Md. (William Hoffenberg, Baltimore, Md., on the brief), for appellee.

Before PARKER, Chief Judge, and DOBIE, Circuit Judge, and BARKSDALE, District Judge,

DOBIE, Circuit Judge.

This is an appeal from a judgment of the United States District Court for the District of Maryland in favor of Sherwood Distilling Company (appellee here and plaintiff below, hereinafter called Sherwood) against the Reconstruction Finance Corporation (hereinafter called R.F.C.), after a trial before the Court sitting without a jury. The judgment was for $42,544.31, representing expenditures of $33,281 made by Sherwood for the purpose of completing a livestock feed recovery plant on land which was conveyed by it to R.F.C. in accordance with a written agreement between them, together with interest thereon in the amount of $9,263.31. The judgment also ordered R.F.C. to reconvey the said land to Sherwood with the right in R.F.C. to remove the building and machinery.

In the summer of 1945 the Department of Agriculture found that a critical shortage of livestock feed existed and would continue, possibly through 1947. One means of alleviating this shortage was to recover grain from distillery slop, which was then being largely wasted. This process required special drying equipment, operated in conjunction with the distilleries. Sherwood operated a distillery at Westminster, Maryland, which had no feed recovery facilities.

After a lengthy correspondence, instigated by President Mann of Sherwood, an elaborate written contract was entered into, October 22, 1945, between R.F.C. (called

the Lessor) and Sherwood (called the Lessee). The case before us involves the interpretation of this contract, so we shall analyze briefly some of its most important provisions.

In Paragraph One, Lessee agreed "forthwith upon the execution of this agreement", to convey to R.F.C. the site for the plant. Subsequently such a conveyance was made. The land in question (80' x 33') was part of Sherwood's tract at Westminster, Maryland, on which its distillery was located. In Paragraph Two, Lessee agreed to prepare and submit to R.F.C. for approval, plans and specifications for the construction and equipping of the plant. Upon securing such approval, Lessee agreed "to proceed in accordance therewith and complete as soon as practicable the construction and equipment of the plant * * * and the acquisition and installation of the Machinery." This paragraph is important as showing that Sherwood assumed the obligation of seeing the job through to a conclusion.

Paragraphs Three and Four provided that, with the approval of R.F.C., Lessee could subcontract the construction of the building and requisition from R.F.C. the necessary funds to pay therefor. In Paragraph Five, Lessee, agreed to purchase the necessary machinery on behalf of R.F.C. and in Paragraph Seven R.F.C. agreed to pay such bills therefor as it had approved.

Paragraph Ten provided:

"Notwithstanding any other provision herein contained, the maximum amount which R.F.C. shall be required to expend hereunder shall not exceed One Hundred Thirty-Five Thousand Dollars ($135,000.)"

Paragraph Eleven specified that title to the buildings and machinery should at all times be vested in R.F.C. Paragraph Twelve, the meat of the case before us, is set forth in full:

"Subject to termination upon the terms hereinafter in this paragraph Twelve provided, R.F.C. hereby agrees to lease, and *does hereby lease, the site, buildings and machinery to be acquired hereunder, to Lessee and Lessee does hereby lease the same* from R.F.C. for a term ending April 1, 1951, which term, upon its expiration, shall be automatically extended, subject to similar termination for an additional period ending April 1, 1953. R.F.C. and Lessee each agrees, upon the written request of the other to execute and deliver such additional instruments of lease as may be necessary to carry out the provisions of this agreement. *This lease* or any extension thereof under this paragraph Twelve *may be terminated by the parties hereto on fifteen (15) days' written notice of either party* to the other given by registered mail as provided in paragraph Twenty-seven hereof." (Italics supplied.)

In Paragraph Thirteen Lessee agreed to pay R.F.C. a rental of $14.28 for each ton of feed produced by the plant. No rental was payable when the plant was not in operation. Paragraph Fourteen permitted R.F.C. to cancel the lease for cause, without giving fifteen (15) days' notice. Paragraph Fifteen granted to Lessee an option, for a period of thirty days after the expiration or termination of the lease, to purchase the plant by reimbursing R.F.C. for its direct investment, with minor adjustments. The remaining paragraphs contained certain of the usual administrative clauses of a lease.

Sherwood entered into a prime contract with the H. K. Ferguson Company, dated as of August 23, 1945, whereby the latter agreed to act as Engineer-Contractor in constructing and equipping the plant. This contract expressly provided that, should the contract between Sherwood and R.F.C. be terminated, R.F.C. could order this engineering contract to be terminated also, in which event Ferguson should "immediately discontinue the Work" and "procure cancellation of all existing commitments." R.F.C. approved the contract on January 4, 1946.

Pursuant to authority granted by this contract, Ferguson entered into five sub-contracts for the construction of the plant building. Each provided expressly that, should the prime contract be terminated, R.F.C. could order the sub-contracts to be

terminated, in which event the sub-contractors should "immediately discontinue the Work" and cancel all commitments. Each of these was approved by R.F.C. and by Sherwood. The prime contract also authorized Ferguson to purchase materials, supplies, machinery and equipment.

In order to insure the proper expenditure of R.F.C. funds, the work was supervised by engineers of R.F.C. Closest to this job was William Bloom, whose duties and authority in the premises were carefully outlined in a resolution of R.F.C's Executive Committee, which was sent to Sherwood January 30, 1946. Bloom sent to Sherwood monthly Status Reports showing the amount of money committed (total Purchase Orders) and the amount disbursed (total Payment Certificates).

By the early part of April, 1946, the Status Reports showed total commitments of approximately $90,000. Since this covered only the machinery and the *foundation* of the building, Bloom saw that the plant could never be completed within the $135,-000 allocated by the government in accordance with the Agreement. Accordingly he told Mann that no money in addition to the $135,000 would be forthcoming from R.F.C. and that Mann should "either put the money into it to complete it, or the building does not get completed." Bloom also said that if the job was completed and if there was any money left in the R.F.C. fund of $135,000, Sherwood would be paid its "reimbursable items" of cost. It was not unusual for a lessee to put its own money into an R.F.C. plant on this basis.

On May 28, 1946, Sherwood signed a private contract with G. Walter Tovell, Inc., contractors, to complete the plant building at a cost of $34,115 to be paid by Sherwood. R.F.C. was not a party to this contract, and it was in no sense an R.F.C. commitment. R.F.C.'s only interest in the contract was from the engineering standpoint. Bloom's estimate of the other costs proved extremely accurate, as shown by the fact that, commencing January 31, 1947, the Status Reports showed total R.F.C. commitments of $134,888.53 out of the appropriation of $135,000 specified in the lease.

On February 3, 1947, R.F.C. sent out to Sherwood and to all lessees of feed recovery facilities notices terminating the contracts, effective fifteen days after receipt, in accordance with the clause contained in all the Agreements. On February 7, a telegram was also received by Sherwood from R.F.C. ordering all work to be stopped immediately. Thereafter no further work was done, except to protect the property. Moreover, R.F.C. and Ferguson proceeded to cancel sub-contracts and Purchase Orders wherever possible, with the result that $8,029.35 was saved for the government from the outstanding commitments, and only $126,940.38 was actually disbursed.

President Mann of Sherwood had said, and R.F.C. had apparently thought, that Sherwood would purchase the plant under the very favorable option granted in Paragraph Fifteen of the lease. Since it could do this by merely repaying R.F.C. for its direct expenditures (with minor adjustments), Sherwood would thus be able substantially to recover its investment. Some distillers did just that. On February 12, 1947, R.F.C. asked Sherwood whether it intended to purchase the property under the option or by negotiation (i. e. at a lower price). However, Sherwood did nothing except to consult its attorney, who averred that the termination was improper. In October R.F.C. had the plant inspected by an industrial engineer, who reported that the cost of dismantling the building and removing the equipment was "almost prohibitive."

Although the alleged cause of action arose on February 3, 1947, this suit was not commenced until July 14, 1949, and was brought to trial February 19, 1952. It was stipulated that the result in this case would govern that in a companion suit filed by Foust Distilling Company, also owned by Mann, which involves similar facts.

The District Judge interpreted the termination clause of the contract (Paragraph 12, set out above) as being effective if, but only if, the plant had been completed. Said the District Judge in the opinion below:

"It will thus be seen from the foregoing analysis of the agreement in

controversy that it contains no express provision covering the situation that is here presented, namely, no provision relating to what the parties contemplated should be done in the event the R.F.C. abandoned the project before completion, as has been done. Also,— and the Court feels that this is an important fact,—the so-called lease or agreement to lease has no beginning date stipulated in it.

"After a careful review of the extended evidence in this case the Court reaches the conclusion that from the weight of the credible evidence, read in the light of what the Court believes is the proper interpretation to be placed upon the contract, Sherwood is entitled to all of the relief which it is now seeking.

"There has already been given in this opinion a statement of the two grounds upon which Sherwood relies. The first ground is that there was a breach of the contract by R.F.C. We believe this position is correct. We find nothing in the contract that speaks of what shall be done in the event of termination of the contract before completion of the plant. We believe that the right given to terminate the contract is predicated upon the plant being completed, when all of the terms and conditions of the contract and the action of the parties thereunder are taken into account.

* * * *

"The contract specifies no beginning date. This seems clearly to support the contention of counsel for plaintiff that the contract should be construed, not as an out-and-out lease, but rather as an agreement to lease, and that the term was intended to begin only upon the completion of the plant. We feel that that is borne out by the language employed in paragraph twelve, i.e., that 'R.F.C. hereby agrees to lease, and does hereby lease, the site, buildings and machinery *to be acquired hereunder,* * * *.' (Emphasis supplied.) Our conclusion is also confirmed rath-

er strongly, we believe, by paragraph thirteen, which provides that *the rent shall be based on what* the plant produces. Thus this contract is not like the ordinary one where a person leases property and charges so much rental, and where the lessor does not care how the lessee acquires the money to pay the rent. Here the entire agreement is predicated upon *a going concern—upon production;* and the rental is based *upon production.* It is a cooperative agreement. The Government, as the contract alleges, wanted to do something in the public interest to prevent a shortage of livestock feed, and so it asked the assistance of distillers. In order to insure the construction of the so-called 'plancors' which were really additions to the distillery plants, the Government provided the major 'where-with', namely, most of the funds for the construction of the new plants, and said to the distillers, in effect, 'If you do so and so, you can have the results of our joint enterprise, provided we are allowed so much periodically out of what is earned, and we are to have the plant as a going concern, with the right to dispose of it, if we so desire, to somebody else, provided you do not want to buy it as a going concern, which we give you the right to do, on certain terms and conditions.' "

The District Judge also stressed the clauses in the contract giving Sherwood the right of purchase and then stated "We believe that when these provisions are read in relation to the entire agreement, they contemplate the giving of the options only upon the plant as a completed structure."

■ With this interpretation of the termination clause of the contract, even when read in the light of the entire contract, we cannot agree. This termination clause is absolute and unconditional on its face. We find nothing in the other clauses of the contract which would justify us in *adding* to the termination a *new* limitation that the right to terminate (by either party) could be exercised *only after the completion of the project.* To say (as apparently

the District Judge says) that immediately before the completion of the project neither party could terminate; but that, immediately after the project's completion, either party could terminate, seems to us a strained and unreasonable interpretation of the contract.

The record shows that approximately ten of these leases covering similar feed recovery facilities were terminated prior to completion of construction. In each of the ten leases the termination clause was substantially the same as in the Sherwood contract, and was a standard form. Only one other suit has apparently arisen out of the termination of these contracts. Belvidere Distilling Co. v. Reconstruction Finance Corporation, D.C., 109 F.Supp. 298. It is true that the civil action there (brought to reform the contract) was cast in a somewhat different mould from the present case. Yet, we find confirmation for the conclusion we have reached in two extracts from District Judge Campbell's opinion in the Belvidere case:

> "*However, as written, the contract provided that it could be terminated upon 15 days' written notice, and contained no proviso that the lease was not to take effect until after installation of the machinery or that the lease could not be terminated until that time.* * * *

> "It is only fair to state, however, that the law seems clear that plaintiff should be precluded from relief by its act of signing the lease when it knew, or ought to have known, that *it permitted the defendant to terminate at any time, without regard to completion of construction and installation of machinery.*" (Italics supplied.)

█ It is well established that the interpretation placed upon a contract by the parties themselves, before a dispute has arisen, is entitled to the greatest weight. Progressive Furniture Co. v. Stoneville Furniture Co., 4 Cir., 192 F.2d 869; National Union Mortgage Corp. v. Potomac Consolidated Debenture Corp., 178 Md. 658, 16 A.2d 866.

There is no little evidence here that both R.F.C. and Sherwood recognized that the contract could be terminated at any time. Particular reference may be made to Mann's contract and correspondence with Ferguson, the Engineer-Contractor; Ferguson's five sub-contracts for the construction of the building, three of which were approved in writing by Mann, and two by Maynard, Sherwood's Secretary.

Ferguson also issued fifty-seven Purchase Orders for the purchase of machinery and equipment, thirty-one of which were personally approved by Mann in writing and the rest by Maynard. Each Purchase Order incorporated by reference the "Uniform Termination Article" promulgated in the Federal Register. This provided that the work could be terminated by the Government at any time:

> "The performance of work under this contract may be terminated by the Government in accordance with this Article in Whole, or from time to time in part, whenever the contracting officer shall determine any such termination is for the best interests of the Government."

It might well be that Sherwood was disappointed when R.F.C. elected to terminate this contract, with the result that Sherwood was never able to get into production. It is easy, though, to envisage situations under which it might have been to Sherwood's interest to terminate this contract. And we think either R.F.C. or Sherwood had the right of termination, after notice, at any time. In any event, the parties, R.F.C. and Sherwood, entered into this contract with their eyes open. So, however the chips may fall, they must abide by the contract as it was written. We cannot make a new contract for them.

Nor can we agree with the view of the District Judge that R.F.C. was estopped to exercise its right of termination. Sherwood bases this estoppel upon the representations of Bloom, R.F.C.'s local engineer at the project.

There are many things which negate any estoppel here. The District Judge stated "during the period when these (Bloom's) representations were made, Sherwood gave R.F.C. the deed for the plant site."

Bloom's conversation with Mann took place in April and the deed was delivered in October. In the very first paragraph of the lease Sherwood agreed "forthwith upon the execution of this agreement to convey to R.F.C. the site for said additional facilities." Its delivery of the deed was in pursuance of that obligation, not of what Bloom said.

The District Judge thought there was evidence of estoppel in the fact that Sherwood had spent $52,911 for new boilers to operate the plant. Sherwood did not claim this expenditure as part of its damages. The new boilers, like the old, were located in the *distillery* owned by Sherwood, and were to be used to operate it as well as the nearby feed recovery plant. The record shows that as early as July, 1945, Sherwood was considering new boilers because of the age and insurance criticism of the old. The boiler work was started long before April, 1946. In fact, Sherwood was sued for the cost of the work, and the history of that project is set out in the state court's opinion. Sherwood Distilling Co. v. Heat & Power Corp., Md., 1951, 78 A.2d 759. Clearly, this work had no connection with the Bloom-Mann conversation.

■ The conclusion seems fair that Sherwood's actions were taken in reliance upon the terms of the contract, not upon the Bloom-Mann conversations, and that Sherwood did not prejudicially change its position by virtue of anything that Bloom said. Leggett v. Standard Oil Co., 149 U.S. 287, 13 S.Ct. 902, 37 L.Ed. 737; Cook v. Commercial Casualty Insurance Co., 4 Cir., 160 F.2d 490; Milburn v. Michel, 137 Md. 415, 112 A. 581.

Finally, in this connection, if Bloom did make any representations to Mann, purporting to bind R.F.C. beyond the terms of the written contract, (as to which the evidence is conflicting), these representations were clearly beyond the authority of Bloom, and Sherwood was fully apprised of the nature and extent of Bloom's authority. See, particularly, Reconstruction Finance Corporation v. Martin Dennis Co., 3 Cir., 195 F.2d 698. See, also, Federal Crop Insurance Corporation v. Merrill, 332 U.S. 380, 384, 68 S.Ct. 1, 92 L.Ed. 10; Coen v. American Surety Co., 8 Cir., 120 F.2d 393; Gontrum v. Mayor and City Council of Baltimore, 182 Md. 370, 35 A.2d 128.

The District Court's interpretation of the termination clause of the contract unjustly enriches Sherwood. The contract itself contained an elaborate provision by which Sherwood could itself prevent unjust enrichment of R.F.C. If the lease were terminated by either party, Sherwood would have thirty days within which to purchase the land, building and machinery by paying R.F.C.'s direct cost. In other words, Sherwood could have its land back for $1 and the building and machinery at cost. The latter was to be reduced by the amount of any rentals paid by Sherwood, or by depreciation incurred. Furthermore, Sherwood did not have to reimburse R.F.C. for overhead or any other indirect expenses, of an engineering, administrative, legal or financial nature, which must have been considerable. Sherwood, too, was given the right to buy at any lower price which it could negotiate with R.F.C. This was clearly considered by the parties as a valuable option.

R.F.C. always anticipated that Sherwood would purchase the plant and in that way recover its expenditures. The record shows that Mann stated to R.F.C. that "he intended to purchase the plant and that he would complete the building with his own money." After the termination, R.F.C. wrote Mann a letter inquiring as to his intentions. On August 1, 1947, Mann inquired by letter whether "the property has now become Surplus and will be offered for sale in the very near future." Mann decided not to buy but to ask the Court's help instead.

For the reasons we have set out, the judgment of the District Court must be reversed.

Reversed.