**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

WASHINGTON SQUARE SECURITIES,
INCORPORATED,
                    *Plaintiff-Appellant,*

                    v.

JAMES K. AUNE; VIRGINIA M.
NORMAN, individually and as the
executrix of the Estate of Howard
W. Norman and trustee of the
Howard and Virginia Norman
Charitable Trust; PATRICIA J.
WALKER; FRED W. MILTZ, Trust
Manager of the SAM Trust,
                    *Defendants-Appellees.*

No. 03-1937

Appeal from the United States District Court
for the Western District of North Carolina, at Charlotte.
Richard L. Voorhees, District Judge.
(CA-02-308-3-V; CA-02-309-3-V)

Argued: June 2, 2004

Decided: September 23, 2004

Before WILKINS, Chief Judge, LUTTIG, Circuit Judge,
and Louise W. FLANAGAN, United States District Judge
for the Eastern District of North Carolina,
sitting by designation.

Affirmed by published opinion. Judge Flanagan wrote the opinion, in
which Chief Judge Wilkins and Judge Luttig joined.

**COUNSEL**

**ARGUED:** Burton W. Wiand, FOWLER WHITE BOGGS BANKER P.A., Tampa, Florida, for Appellant. Joel Arnold Goodman, GOODMAN & NEKVASIL, P.A., Clearwater, Florida, for Appellees. **ON BRIEF:** Hala A. Sandridge, Elaine M. Rice, FOWLER WHITE BOGGS BANKER P.A., Tampa, Florida, for Appellant.

---

**OPINION**

FLANAGAN, District Judge:

This appeal arises from the commencement of arbitration proceedings by appellees James K. Aune and other investors (collectively "the Investors") against appellant brokerage firm Washington Square Securities, Inc. ("Washington Square"). Washington Square sought a declaratory judgment in district court halting the arbitration. Applying North Carolina contract and agency principles, the district court determined that Washington Square was bound to arbitrate by virtue of its membership in the National Association of Securities Dealers, Inc., ("NASD"), and dismissed the action. Albeit on different reasoning, we affirm.

I.

Appellees invested in ETS Payphone Equipment, Inc., and Worldwide Growth Partners, Inc. Series B/Evergreen Security Ltd. ("ETS and Evergreen") at various times from late 1997 through 1998. During that time, Richard White, the investment broker for each of these transactions, was acting as an associated person of NASD member Washington Square. As such, White was employed and authorized by Washington Square to sell securities on its behalf, but White was free to participate in other business opportunities unrelated to Washington Square. Washington Square did not authorize or have knowledge of the ETS and Evergreen investment transactions. As a result of their investments in ETS and Evergreen, the Investors collectively sustained losses in excess of $1,000,000.00.

On March 13, 2002, the Investors filed an arbitration claim before the NASD, seeking to hold Washington Square responsible for White's sale of allegedly fraudulent ETS and Evergreen investments, on grounds that Washington Square acted through White as his employer and otherwise failed to take adequate steps to supervise White. The Investors sought damages against Washington Square based upon North Carolina securities laws, breach of contract, common law fraud, breach of fiduciary duty, negligence, and gross negligence.

Washington Square filed two separate actions[1] in the Western District of North Carolina on July 26, 2002, seeking a declaratory judgment that there was no valid agreement to arbitrate between Washington Square and the Investors, and seeking injunctive relief staying the arbitration before the NASD. Upon the Investors' motion to compel arbitration, the court dismissed Washington Square's complaint seeking declaratory judgment and denied Washington Square's motion for preliminary injunction.

In reaching its decision, the court first determined that there was no presumption in favor of arbitration, given that Washington Square and the Investors never entered into an agreement to arbitrate. Nonetheless, based on the plain language of Rule 10301 of the NASD Code, White's representative agreement with Washington Square ("Form U-4"), and the circumstances surrounding the ETS investment transaction, the court concluded that the Investors were entitled to arbitrate under North Carolina law as third-party beneficiaries of the NASD Code.

The district court declined to consider Washington Square's extrinsic evidence bearing upon the meaning of the term "customer" in the NASD arbitration provision, reasoning that consideration of such evidence was unnecessary because "the language of the NASD Arbitration Code provisions is not ambiguous." J.A. 515. Moreover, the court

---

[1]Washington Square filed one action against appellees James K. Aune, Howard W. Norman, Virginia M. Norman, and Patricia J. Walker (3:02-CV-308-V), and a second action against appellee Fred W. Miltz, Jr. (3:02-CV-309-V). The district court issued a combined order dismissing both cases.

reasoned that the extrinsic evidence offered by Washington Square was not dispositive of the meaning of the language in the NASD Code.

As an alternative basis for its decision, the district court determined that North Carolina's agency principles were sufficient to compel arbitration. Without allowing discovery, and based on allegations by the Investors as to representations made by Mr. White at the time of the ETS transactions, the court found "ample evidence" that Mr. White acted with apparent authority from Washington Square. J.A. II. 514. Accordingly, the district court held that the Investors were entitled to compel arbitration in their dispute with Washington Square.

II.

Washington Square raises several issues on appeal. In particular, it contends that the district court erred by applying Rule 10301 of the NASD Code without looking to additional language in Rule 10101, which states the eligibility requirements for arbitrable disputes. Washington Square also argues that there exists a latent ambiguity in the language of the NASD arbitration rules, and that the district court should have resolved this ambiguity by resort to its extrinsic evidence of the parties' intent. Finally, Washington Square challenges the district court's denial of discovery on the issue of whether White was acting as an agent of Washington Square. These are issues of first impression in this Circuit, and, as the district court noted, federal courts are divided over arbitrability of disputes between a NASD member and investors who conduct transactions through an associated person of the member. *Compare John Hancock Life Ins. Co. v. Wilson*, 254 F.3d 48, 59 (2nd Cir. 2001) (finding that the NASD Code unambiguously requires arbitration in such circumstances), and *Vestax Secs. Corp. v. McWood*, 280 F.3d 1078, 1082 (6th Cir. 2001) (same), and *California Fina Group, Inc. v. Herrin*, __ F.3d __ 2004 WL 1663847 *6 (5th Cir. 2004) (same), *with Investors Capital Corp. v. Brown*, 145 F. Supp. 2d 1302, 1308 (M.D. Fla. 2001) (holding that investors' status as "customer" under the NASD Code turns on the factual issue of whether the investors attempted to have an "informal business relationship" with the member).

III.

A.

The court reviews *de novo* a district court's determination that a dispute is arbitrable. *Cara's Notions v. Hallmark Cards*, 140 F.3d 566, 569 (4th Cir. 1998).

We address first the district court's finding that no presumption in favor of arbitration applied in this case because the Investors and Washington Square never entered into an agreement to arbitrate. Washington Square urges the court to follow the reasoning of the district court on this point. We find Washington Square's argument and the reasoning of the district court unpersuasive.[2]

The obligation and entitlement to arbitrate "does not attach only to one who has personally signed the written arbitration provision." *Int'l Paper Co. v. Schwabedissen Maschinen & Anlagen GMBH*, 206 F.3d 411, 416 (4th Cir. 2000). Rather, "[w]ell-established common law principles dictate that in an appropriate case a nonsignatory can enforce, or be bound by, an arbitration provision within a contract executed by other parties." *Id.* at 416-417.

The NASD Code of Arbitration Procedure, Rule 10301(a), provides:

> Any dispute, claim or controversy eligible for submission . . . between a customer and a member and/or associated person arising in connection with the business of such member or in connection with the activities of such associated persons shall be arbitrated under this Code, as provided by any duly executed and enforceable written agreement or upon the demand of the customer.

---

[2]Contrary to appellant's argument, when affirming, we are not bound to follow the reasoning of the district court in the absence of a cross appeal by appellees. *Ithaca Indus., Inc. v. Comm'r of Internal Revenue*, 17 F.3d 684, 686 n.2 (4th Cir. 1994).

J.A. II. 449. The NASD Code constitutes an "agreement in writing" under the Federal Arbitration Act, 9 U.S.C. § 2, which binds Washington Square, as an NASD member, to submit an eligible dispute to arbitration upon a customer's demand. *See Kidder, Peabody & Co., Inc. v. Zinsmeyer Trusts P'ship*, 41 F.3d 861, 863-64 (2nd Cir. 1994). Because this arbitration agreement binds Washington Square, the remaining issue is whether the Investors are "customers" whose dispute falls within its scope.

"[T]he examination of the scope of an arbitration agreement is primarily a task of contract interpretation." *Cara's Notions*, 140 F.3d at 569. "[A]s with any other contract, the parties' intentions control." *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth*, 473 U.S. 614, 626 (1985). Nevertheless, "in applying general state law principles of contract interpretation to the interpretation of an arbitration agreement within the scope of the [Federal Arbitration] Act, due regard must be given to the federal policy favoring arbitration." *Volt Info. Sciences, Inc. v. Bd. of Trs. of Leland Stanford Jr. Univ.*, 489 U.S. 468, 475-76 (1989) (citing 9 U.S.C. § 2).

Pursuant to this policy, the parties' intentions "are generously construed as to issues of arbitrability," *Mitsubishi*, 473 U.S. at 626, and any "ambiguities as to the scope of the arbitration clause itself" must be "resolved in favor of arbitration." *Volt*, 489 U.S. at 476. "[T]here is a presumption of arbitrability in the sense that 'an order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage.'" *AT&T Techs., Inc. v. Communications Workers of America*, 475 U.S. 643, 650 (1986) (quoting *United Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582-83 (1960)). "In the absence of any express provision excluding a particular grievance from arbitration, . . . only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail, particularly where, as here, . . . the arbitration clause [is] quite broad." *Warrior & Gulf*, 363 U.S. at 584-85.

Applying these principles to the case at hand, we hold that the district court did not err in compelling arbitration.

B.

Turning first to the language of the NASD Code, we find Rule 10301 susceptible to a meaning which covers the Investors' dispute. The primary requirements for arbitrability under Rule 10301 are that the dispute must (1) be "between a customer and a member and/or associated person," and (2) arise "in connection with the business of such member or in connection with the activities of such associated persons." J.A. II. 449.

The language of the first clause, "between a customer and a member and/or associated person," is ambiguous in two respects. The first ambiguity results from the fact that the rule does not specify with whom the customer must conduct business. That is, as written, the rule leaves open the possibility that a dispute could arise between "a [member's] customer and a member" *or* between "[an associated person's] customer and a member." Under the latter interpretation, the Investors' dispute falls within the scope of the rule because it is undisputed that the Investors were customers of White, and that White was an associated person of the member Washington Square.

The first clause is also ambiguous because, even assuming that the dispute must arise between the member's customer and the member, it is not clear from the language of the rule what is required before an investor is deemed a customer of a member. While the rule is susceptible to an interpretation under which only consumers with accounts or "informal business relationships" with the member are customers of the member, *Investors Capital*, 145 F. Supp. 2d at 1308, the language of the Code does not exclude as "customers of members" those investors who believed they were dealing with the member through an associated person. *See John Hancock*, 254 F.3d at 59 (noting that definition of "customer" in the Code, at Rule 0120(g), excludes only "a broker or dealer"). Although the broader interpretation is not the only reasonable interpretation of the rule, much less the one required by the plain language of the rule, it is nonetheless one which encompasses the Investors' dispute in this case. Accordingly, because this clause is ambiguous in two separate respects which cover the instant dispute, we must construe this clause in favor of arbitration.

The relevant language from the second clause, "arising in connection with the business of such member or in connection with the activities of such associated persons," is also ambiguous. Assuming, *arguendo*, that only the first half of this requirement ("arising in connection with the business of the member") is applicable here, the meaning of "in connection with the business" is nonetheless open to multiple interpretations. "The business" of a member reasonably can be interpreted either narrowly to extend only to the sale of its financial products, as Washington Square urges, or broadly to refer to supervision over associated persons, as other courts have found. *See WMA Sec. Inc. v. Ruppert*, 80 F. Supp. 2d 786, 790 (S.D. Ohio 1999) (finding that where the investors' claims "arise from [the member's] failure to supervise its registered representatives," the claims "are therefore related . . . to [the member's] business"); *First Montauk Sec. Corp. v. Four Mile Ranch Dev. Co.*, 65 F. Supp. 2d 1371, 1379 (S.D. Fla. 1999) (same). Under the latter interpretation, the Investors' dispute falls within the scope of the clause, as their claims arise in connection with Washington Square's supervision of White. Accordingly, because both the first and second clauses of Rule 10301 are susceptible to a meaning which covers the Investors' dispute, Rule 10301 must be construed in favor of arbitration.

C.

Washington Square argues that Rule 10101 further limits the field of arbitrable disputes, to the exclusion of the Investors' instant dispute. This argument is without merit, as the Rule is at best ambiguous as to whether any additional limitations are imposed. Rule 10101, which is incorporated by reference into Rule 10301, provides in relevant part:

> This Code of Arbitration Procedure is prescribed and adopted . . . for the arbitration of any dispute, claim, or controversy arising out of or in connection with the business of any member of the Association, or arising out of the employment . . . of associated person(s) with any member, with the exception of disputes involving the insurance business of any member which is also an insurance company:
>
>          * * *

(c) between or among members or associated persons and public customers, or others; . . . .

J.A. II. 447. Rule 10101 contains a requirement similar to that found in Rule 10301 that the dispute arise "in connection with the business of any member." As explained previously, this clause is susceptible to an interpretation which encompasses the Investors' dispute concerning Washington Square's supervision over its associated person, White.

Furthermore, the limitation in subsection (c) of the Rule to disputes "between or among members or associated persons and public customers, or others" is of questionable applicability to the instant dispute. Beginning with the clause "with the exception of disputes involving the insurance business," the language in the Rule can reasonably be read to apply only to insurance disputes rather than all other disputes described in the Rule. *See Kidd v. Equitable Life Assurance Soc'y of the United States*, 32 F.3d 516, 519 (11th Cir. 1994) (finding that "the colon [in Rule 10101] modifies the clause immediately preceding it" thus making subsections (a)-(d) applicable only to insurance business disputes). Thus, any further limitation provided by subsection (c), assuming one is unambiguously stated therein, is not necessarily applicable to the dispute at hand. Accordingly, we must resolve these doubts as to whether Rule 10101 encompasses the instant dispute in favor of coverage.

### D.

Washington Square argues that any ambiguity in the term "customer" in Rules 10101 and 10301 is a "latent ambiguity" that, under North Carolina law, must be resolved by looking to extrinsic evidence of the parties' intent. *See Root v. Allstate Ins. Co.*, 158 S.E. 2d 829, 835 (N.C. 1968) (stating that "parol or extrinsic evidence may be introduced to show what was in the minds of the parties at the time of making the contract or executing the instrument, and to determine the object for or on which it was designed to operate.").

Having already construed the ambiguity in the language of the NASD Code in favor of arbitration pursuant to federal law, we question whether other evidence of the parties' intent is relevant. The

Supreme Court directive to resolve doubts and ambiguities in favor of arbitration appears to foreclose recourse to extrinsic evidence of intent. *Volt*, 489 U.S. at 475-76; *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983). Finding doubts as to the scope of the NASD Code arbitration provision, our inquiry should be complete.

Nevertheless, the Supreme Court has also indicated that "forceful evidence of a purpose to exclude the claim from arbitration" may help to resolve ambiguity in an arbitration provision. *See Warrior & Gulf*, 363 U.S. at 585. Other Circuits, too, have recognized the relevance of additional evidence of the parties' intent, under limited circumstances. As the Fifth Circuit explained:

> A finding that the scope of the arbitration clause is vague does not automatically catapult the entire dispute into arbitration. Rather, such a finding creates a presumption in favor of arbitration. *This presumption can be overcome with clear evidence that the parties did not intend the claim to be arbitrable*.

*Harvey v. Joyce*, 199 F.3d 790, 793 (5th Cir. 2000) (citing *Moses H. Cone*, 460 U.S. at 24-25) (emphasis added); *see also In re Dist. No. 1 - Pac. Coast Dist., Marine Eng'rs' Ben. Ass'n (AFL-CIO)*, 723 F.2d 70, 77 (D.C. Cir. 1983) (noting that "*compelling evidence* that the parties intended to exclude the subject matter from arbitration" could be considered) (emphasis added); *John Hancock*, 254 F.3d at 61 (concurring op.) (noting that, if available, extrinsic evidence "that, for example, the drafters of NASD Rule 10301(a) intended that an investor must be a customer of the member — and not just a customer of the associated person of the member — in order to force the member to arbitrate" is relevant).

In this case, we need not decide whether federal law prevents recourse to extrinsic evidence of intent to resolve an ambiguity in an arbitration provision, as we find that the extrinsic evidence offered by Washington Square is neither "forceful" nor "clear" evidence of NASD intent as to the scope of the NASD arbitration provision. *Warrior & Gulf*, 363 U.S. at 585; *Harvey*, 199 F.3d at 793.

Washington Square offers as extrinsic evidence of the parties' intent a declaration by Philip J. Hoblin, Jr., a "Charter Member" of the Securities Industry Conference on Arbitration,[3] who stated in May 2002:

> It was the intention of SICA, and its members, that the arbitration process would be broad and encompass all claims that could be brought against a broker-dealer by (i) another broker-dealer; (ii) an associated person; or (iii) a customer of the broker dealer. It was not our intention that either the arbitration process or the Uniform Code of Arbitration Procedure would require mandatory arbitration of claims brought against a broker-dealer by a person who was not a customer of that broker-dealer.

J.A. I. 195 (emphasis added). In addition, Washington Square offers a declaration of Thomas Wiltrakis, a former "Director of Arbitration for the NASD," who also stated in May 2002 that it was the view of the NASD (from 1979 to 1983) that "[i]f a person was not a customer of a broker-dealer, the broker-dealer was not required to arbitrate those claims." J.A. I. 199. In its brief, Washington Square also urges: "The drafters did not specifically address arbitrability of disputes brought by customers of registered representatives who were not customers of broker-dealers because they never contemplated the arising of this situation in broker-dealer arbitration. (JA1-196)." Corrected Brief of Appellant, p. 18 (citation in original).

The evidence presented fails in several respects to clearly indicate the intent of the NASD to exclude the instant dispute from the scope of the arbitration agreement. First, declarations made in 2002 during the course of litigation are much less reliable evidence of NASD intent than contemporaneous statements, reports, or minutes of the NASD at the time it adopted the arbitration provision. *See Redd v. Taylor*, 153 S.E.2d 761, 767 (N.C. 1967) (considering oral declarations of testator at time will was drafted); *Root*, 158 S.E.2d at 836 (considering "evidence of prior negotiations" to aid in resolving latent

---

[3]The Securities Industry Conference on Arbitration [SICA] "was formed in April of 1977 for the purpose of developing a uniform system of arbitration for the securities industry, including [NASD]." J.A. I. 194.

ambiguity in description of property in contract); *Vestal v. Vestal*, 271 S.E.2d 306, 309 (N.C. Ct. App. 1980) (citing *Miller v. Green*, 112 S.E. 417 (N.C. 1922) (relevant extrinsic evidence consists of "preliminary negotiations and surrounding circumstances")); *see also Reconstruction Fin. Corp. v. Sherwood Distilling Co.*, 200 F.2d 672, 676 (4th Cir. 1952) ("[T]he interpretation placed upon a contract by the parties themselves, *before a dispute has arisen*, is entitled to the greatest weight.") (emphasis added). Therefore, the declarations submitted here are not the "most forceful" or "compelling" evidence bearing on the parties' intent. *Warrior & Gulf*, 363 U.S. at 585; *In re Dist. No. 1*, 723 F.2d at 77.

Second, the declarations do not indicate whether the NASD specifically intended to exclude disputes between a customer *of a person associated with the member* and a member. Rather they only state that the NASD did not intend to include "claims brought against a broker-dealer by a person who was not a customer of that broker dealer." J.A. I. 195. This falls short of clear evidence of an intention to affirmatively *exclude* the Investors' particular type of dispute from arbitration. *See Warrior & Gulf*, 363 U.S. at 585; *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995).

Third, even accepting that only a "customer of a broker-dealer" (as opposed to a customer of an associated person) can arbitrate with a broker-dealer, the declarations do not specify what is required before an investor is a "customer of a broker-dealer." As noted earlier, nothing in the language of the Code excludes from the class of "customers of a member" those who believed they were dealing with the member through an associated person. While Washington Square wishes to limit "customers" of members to those who opened accounts with the broker, or to those who had an informal business relationship with the broker, neither the plain language of the rule nor the extrinsic evidence of intent requires such an interpretation.

Finally, Washington Square undermines the force of its evidence of intent by noting that the Code "drafters did not specifically address arbitrability of disputes brought by customers of registered representatives who were not customers of broker-dealers because they *never contemplated the arising of this situation in broker-dealer arbitration*." Corrected Br. of Appellant, p. 18 (emphasis added). If the

drafters did not contemplate this situation in broker-dealer arbitration, then it cannot follow that they unambiguously intended the provision to be interpreted against arbitration in these circumstances.

For the foregoing reasons, even considering Washington Square's extrinsic evidence of intent, we do not find that it, in conjunction with the language of the arbitration provision, clearly reveals the intent of the parties to limit the scope of the provision to the exclusion of the Investors' dispute. Therefore, the Investors' dispute is arbitrable.[4]

## IV.

Finding the instant dispute arbitrable, we affirm the district court's order and judgment compelling arbitration, denying the injunction, and dismissing the declaratory judgment action.

*AFFIRMED*

---

[4]In so holding, we need not address the district court's additional reliance upon the language in the Form U-4 or the district court's alternative finding that North Carolina's agency principles are sufficient to compel arbitration without further discovery on this issue.