**Jean BENSADOUN, Plaintiff–Appellant,**

v.

**Marie Therese JOBE–RIAT, Pierre Schmidt, Salvatore Rasino, Louisette Buchard, Gaston Buchard, Liliane Girardin, Patrick Gouiran and Catherine Peiretti, Defendants–Appellees.**

**Docket No. 02–7053.**

United States Court of Appeals, Second Circuit.

Argued: Oct. 16, 2002.

Decided: Jan. 13, 2003.

Brian D. Graifman, Gusrae, Kaplan & Bruno, PLLC, New York, N.Y., for Plaintiff–Appellant.

Richard C. Fooshee, New York, N.Y, for Defendants–Appellees.

Before: MESKILL, NEWMAN, and POOLER, Circuit Judges.

JON O. NEWMAN, Circuit Judge.

This appeal concerns the issue of arbitrability in the context of the rules of the National Association of Securities Dealers ("NASD"). Plaintiff–Appellant Jean Bensadoun, a stockbroker registered with the NASD, appeals from the January 9, 2002, judgment of the District Court for the Southern District of New York (Jed S. Rakoff, District Judge) dismissing his suit for declaratory and injunctive relief to prevent the Defendants–Appellees, eight investors ("the Investors"),[1] from requiring him to arbitrate their claims against him. We conclude that the suit was prematurely dismissed, and therefore vacate and remand for further proceedings.

---

1. The Investors are Marie Therese Jobe–Riat, Pierre Schmidt, Salvatore Rasino, Louisette Buchard, Gaston Buchard, Liliane Girardin, Patrick Gouiran and Catherine Peiretti. They are residents of France, Switzerland, and Germany. Bensadoun is a citizen of New York.

## Background

*Underlying allegations.* In June 2001, the Investors filed a Statement of Claims ("SOC") for arbitration with the NASD. The SOC named as respondents Bensadoun, two brokerage firms for which he worked during the relevant time period, UBS Paine Webber, Inc. ("Paine Webber") and Salomon Smith Barney, and Man Financial, Inc. The SOC designated Michel Autard as an "unnamed co-conspirator/respondent." Autard is a resident of Switzerland and, during the relevant periods, was a principal and the managing director of Compagnie Financiere Metropolitaine SA ("CFM"), a Swiss company. Although not a party to this action or the underlying arbitration, Autard was allegedly a key participant in the alleged fraud and conspiracy that precipitated the present controversy.

The SOC alleges that Bensadoun and Autard conspired to defraud the Investors, resulting in a net loss of $1,136,274. According to the SOC, the Investors made a series of fund transfers to Paine Webber in 1998. Bensadoun, then employed by Paine Webber, was the account representative for the brokerage accounts into which the funds were initially transferred. These transfers were made on the Investors' understanding that Autard would "open accounts for them at PaineWebber and that he would invest the proceeds in a combination of stocks and bonds." Instead, Autard and Bensadoun deposited the Investors' funds in accounts held under CFM's name, which prevented the Investors from receiving copies of monthly statements and confirmations. The SOC implies that the pooling of funds in an account held in the name of CFM was done without Investors' knowledge or consent.

At some point after the first CFM account was opened, Pierre Schmidt, one of the Investors, alleges that he discovered that the account was not registered in his name and he called Bensadoun to complain about this fact. The SOC alleges that Bensadoun told Schmidt that "the funds were being held temporarily in the account of CFM in order to complete certain administrative tasks." Bensadoun allegedly told Schmidt that he would open an account in Schmidt's name. Bensadoun did open the account in Schmidt's name, but the address on the account was CFM's instead of Schmidt's. The SOC alleges that Autard and Bensadoun conspired to keep Schmidt uninformed about this second account.

In its Answer and Defenses to the SOC, filed with the NASD Arbitration Panel, Paine Webber asserts that, in opening this account, Schmidt executed a form granting trading authority on the account to Michel Autard. Paine Webber asserts that three accounts are at issue; two accounts opened under CFM's name and a separate account opened under Schmidt's name. The SOC implies, without directly stating, that the second CFM account referred to by Paine Webber and the Schmidt account were in fact the same.

When Bensadoun transferred his employment to Smith Barney, some portion of the Paine Webber accounts were allegedly transferred to Smith Barney as well. Also, Bensadoun opened an account in the name of Pierre Schmidt at Smith Barney.

The SOC alleges other direct contacts between Bensadoun and the Investors. The SOC alleges that after CFM went into bankruptcy, Bensadoun called Schmidt at his home and "told Schmidt that he had invested money in CFM, and that his father had invested about $80,000 with CFM as well." When Catherine Peiretti sought to withdraw money from her account, Bensadoun allegedly told her that the "money was not available in her account at that

time, and that she would be paid from the CFM account instead"; a third-party check was apparently issued to Ms. Peiretti drawing on CFM funds. The·SOC also alleges that Madame Jobe–Riat and her son-in-law Alban Peiretti faxed memoranda to Bensadoun making inquiries about her investments "in what she thought was her account." The SOC includes as exhibits two letters written by Alban Peiretti on behalf of Madame Jobe–Riat inquiring as to her accounts. The SOC states that following the events complained of, CFM went into bankruptcy and Autard was arrested for embezzlement.

*Bensadoun's suit for declaratory relief.* In December 2001, Bensadoun filed the suit from which this appeal arises, naming the Investors as defendants. Contrary to the usual alignment in stockbroker controversies in which an NASD broker demands arbitration, Bensadoun sought a declaration that the Investors have·no right to arbitrate against him and an injunction preventing the Investors from pursuing arbitration.

Bensadoun submitted a proposed order to show cause why arbitration should not be preliminarily enjoined, supported by his affidavit and a memorandum of law. In this affidavit, Bensadoun declares that none of the Investors other than Schmidt was ever his customer, and that no misconduct is alleged in connection with Schmidt's personal account. He states that he never had any contact with the Investors, other than Schmidt, prior to the closing of the CFM accounts and that he never saw the letters, purportedly addressed to him, that the Investors attached to the SOC. He also says that the accounts that the complaint concerns were opened by CFM, through Autard, and that the accounts enjoyed profits while under Bensadoun's representation. Finally, he states that when the accounts were eventu-

ally closed at the direction of Autard, the funds in the accounts were transferred to CFM's account in Switzerland.

Proceedings before the District Court were apparently quite limited. The Court did not issue the proposed show cause order, and appears instead to have treated it as a "motion to stay arbitration." In response to the proposed order to show cause, the Defendants filed a memorandum opposing the "motion to stay arbitration" and an affidavit of Richard C. Fooshee, the attorney for the Defendants. This affidavit states that the Client Agreements of Paine Webber include an arbitration clause and that Schmidt had such an agreement with Paine Webber.

In January 2002, the District Court issued a brief Memorandum Order denying Bensadoun's "motion to stay arbitration." The Court ruled that "customer," as used in the NASD rules, is to be given a liberal construction. The Court further ruled that the SOC, "liberally construed in favor of the [Investors]," alleges that Bensadoun participated in a scheme to convince the Investors that they were engaged in an "customer-like relationship" with Bensadoun, and that this allegation was "sufficient, on the present sparse record, to support sending the matter to arbitration (without prejudice to any subsequent determination the arbitrators may make, on a fuller record, as to their jurisdiction)."

Because the action had "no other *raison d'etre*" besides the "motion to stay arbitration," the District Court ordered the complaint dismissed, and judgment was entered dismissing the action.

## Discussion

### I. The District Court's Deferral of the Arbitrability Issue

In the absence of a motion to dismiss or for summary judgment, and prior to any

discovery, the District Court dismissed the complaint, acknowledging that the record thus far developed was "sparse." In doing so, the Court appears to have resolved against Bensadoun the factual issues he sought to present. The District Court declined to give close scrutiny to Bensadoun's contentions in the belief that the arbitrators would have an opportunity to evaluate their own jurisdiction on a "fuller record." The case law is clear, however, that " '[u]nless the parties clearly and unmistakably provide otherwise, the question of whether the parties agreed to arbitrate is to be decided by the court, not the arbitrator.' " *John Hancock Life Ins. Co. v. Wilson*, 254 F.3d 48, 53 (2d Cir.2001) (*quoting AT & T Techs. v. Communications Workers of America*, 475 U.S. 643, 649, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986)); *see also Spear, Leeds & Kellogg v. Central Life Assurance Co.*, 85 F.3d 21, 25 (2d Cir.1996) ("Whether or not a matter is arbitrable is a matter for judicial determination.").

■ In *John Hancock*, we ruled that the NASD Code does not evidence a "clear and unmistakable" intent to submit the issue of arbitrability to arbitrators where only one party is a NASD member and the parties do not have a separate agreement to arbitrate. 254 F.3d at 55. The NASD member in *John Hancock*, like Bensadoun here, sought to prevent investors from pursuing arbitration and contended that the investors were not its customers. *Id.* In holding that arbitrability was a matter for the court to decide, we said: "Although John Hancock may be required to submit to arbitration ... we are bound ... to preserve John Hancock's right to ask a court to make that determination." *Id.* The District Court erred in deferring the issue of arbitrability to the arbitrators. The Court was required to render a final decision on Bensadoun's claim that the Investors had no right to arbitrate their claims against him.

Although the District Court erred in deferring the issue of arbitrability, we would not upset the District Court's judgment if there were an alternative ground on which dismissal was warranted. If undisputed facts in the record required the issue of arbitrability to be resolved against the Plaintiff as a matter of law, we could affirm the dismissal and avoid the need for further court proceedings.

■ In the context of motions to compel arbitration brought under the Federal Arbitration Act ("FAA"), 9 U.S.C. § 4 (2000), the court applies a standard similar to that applicable for a motion for summary judgment. *Par–Knit Mills v. Stockbridge Fabrics Co.*, 636 F.2d 51, 54 n. 9 (3d Cir.1980); *Doctor's Associates v. Distajo*, 944 F.Supp. 1010, 1014 (D.Conn.1996), *aff'd*, 107 F.3d 126 (2d Cir.1997). If there is an issue of fact as to the making of the agreement for arbitration, then a trial is necessary. 9 U.S.C. § 4. The present case does not fall squarely under section 4 of the FAA or the cases interpreting it because the Investors never cross-moved to compel arbitration, and the FAA does not provide for petitions (such as Bensadoun's) brought by the party seeking to stay arbitration. Nonetheless, the summary judgment standard is appropriate in cases where the District Court is required to determine arbitrability, regardless of whether the relief sought is an order to compel arbitration or to prevent arbitration. We therefore proceed to review the record to determine whether Bensadoun has raised any triable issue of fact.

II. Is There a Triable Issue as to Whether the Investors Qualify as "Customers" of Bensadoun?

Section 10301(a) of the NASD Code requires arbitration of "[a]ny dispute, claim,

or controversy ... between a customer and a member and/or associated person arising in connection with the business of such member or in connection with the activities of such associated persons ... upon the demand of the customer." Bensadoun concedes that he is an "associated person" for the purposes of NASD arbitration requirements. The only point he contests is whether the Investors qualify as his customers.

■ We have ruled that interpretation of the NASD arbitration provision is a matter of contract interpretation, that New York law applies, and that the provision should thus be interpreted "to give effect to the parties' intent as expressed by the plain language of the provision." *John Hancock*, 254 F.3d at 58. The analysis differs from ordinary contract interpretation in that " 'any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration.' " *Id.* (*quoting Moses H. Cone Memorial Hospital v. Mercury Construction Corp.*, 460 U.S. 1, 24–25, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983)).

The NASD "defines 'customer' broadly, excluding only 'a broker or dealer.' " *John Hancock*, 254 F.3d at 59 (*quoting* NASD Rule 0120(g)). In dicta, we said in *John Hancock* that if there was any ambiguity in the meaning of "customer" as used in Rule 10301, the term should be construed in favor of arbitration. *Id.* The panel expressly rejected the notion that Rule 10301 *"require* [s] indicia of a direct customer relationship between the member and the customer." *Id.* at 60.

However, the facts in *John Hancock* concerning customer status are materially different from the facts in the present case. John Hancock (comparable to Paine Webber in the current case) had a Representative Agreement with an agent known as Fucilo (comparable to Bensadoun in

the present case), which made Fucilo an "associated person" under NASD rules. *Id.* at 51. There was no question that the aggrieved investors were customers of Fucilo's; the only question was whether a customer of an "associated person" could demand arbitration against the member under Rule 10301, or whether, as John Hancock argued, the customers had to be direct customers of the member. *Id.* at 59.

Here, the entire framework is removed by one level. The Investors were customers of Autard (not an associated person), and Autard was a customer of Bensadoun (an associated person); the issue here is whether there needs to be a direct customer relationship between the associated person and the purported customer.

*Oppenheimer & Co. v. Neidhardt*, 56 F.3d 352 (2d Cir.1995), is helpful on this question. In *Oppenheimer*, the securities dealer asserted that claimants seeking arbitration were not "customers" for the purposes of the NASD rules because the account holding their claimed funds was a corporate account controlled by persons other than the claimants. *Id.* at 357. The allegations in that case were similar to those in the present case: claimants turned over money to the securities dealer, allegedly believing that it would be put into accounts under their control, and the dealer conspired with others to put the funds in a corporate account managed by co-conspirators. *Id.* at 354–55. We concluded that the investors were "customers" and could demand arbitration. *Id.* at 356–57. "Having turned over their funds to Oppenheimer's representative so as to become customers of Oppenheimer, the Claimants did not lose the legal benefits of customer status because Oppenheimer's representative fraudulently established their account in a manner designed to

conceal and defeat their interest." *Id.* at 357.

Crucially, however, *Oppenheimer* observed that the "evidence proffered by Claimants, *unless impeached or effectively countered,* is sufficient to establish them as customers of Oppenheimer." *Id.* (emphasis added). We ruled that Oppenheimer's "general denials" and submission of account documents were insufficient. We stated, however, that Oppenheimer's account representative "certainly *might have raised a fact issue* regarding the nature of his relationship with the Claimants," but that he did not do so because he "never denied the Claimants' allegations." *Id.* at 358 (emphasis added). In dicta that seems to presage the present case, we stated:

> Had Oppenheimer offered evidence that it was the Claimants, rather than Oppenheimer's representative, who contrived to place their funds into the EAF account under the control of [others], this might have raised different considerations. But no such evidence was offered.

*Id.* at 357–58.

Other cases provide less direct, although somewhat helpful, guidance on the meaning of "customer." In *Fleet Boston Robertson Stephens, Inc. v. Innovex, Inc.*, 264 F.3d 770 (8th Cir.2001), the Eighth Circuit held that banking advice did not give rise to a "customer" relationship within the meaning of the NASD: " 'customer' in the NASD Code refers to one involved in a business relationship with an NASD member that is related directly to investment or brokerage services." *Id.* at 772; *see also id.* at 773. In *Wheat, First Securities, Inc. v. Green,* 993 F.2d 814 (11th Cir.1993), the Eleventh Circuit held that "customer status ... must be determined as of the time of the events providing the basis for the allegations of fraud," *id.* at 820, so that allegations against a predeces-

sor-in-interest did not give rise to a duty to arbitrate on the part of the successor. *Id.*

In *Lehman Brothers, Inc. v. Certified Reporting Co.,* 939 F.Supp. 1333 (N.D.Ill. 1996), a case involving the New York Stock Exchange ("NYSE") arbitration provisions, the Court ruled that a "customer" relationship arose with a broker when investors purchased stocks in reliance on advice from that broker, even when the investors' actual purchase of stocks was accomplished through other brokerage firms. *Id.* at 1340. The Court sought to interpret "customer" in a way that "further[ed] NYSE policy," *id.* at 1340, including NYSE's goals of " 'maintain[ing] high standards of commercial honor and integrity among its members.' " *Id.* at 1340–41 (*quoting* NYSE Const. art. I, § 2).

■ In light of these cases, particularly *Oppenheimer,* a factual issue emerges upon consideration of the present record. If Bensadoun was complicit in a fraudulent scheme that involved misleading the Investors into believing that they were customers of his and Paine Webber's, then the Investors were his customers for the purposes of the NASD code, and Bensadoun must arbitrate. On the other hand, if the Investors intended to place their funds in the CFM accounts and intended that Autard would exercise sole control over those accounts, then they were not Bensadoun's customers under NASD rules. Otherwise, every purchaser of shares in a mutual fund and every beneficiary of a pension fund would arguably be "customers" of every investment institution with which those funds did business, and would be entitled to demand arbitration under the NASD. This is not to say that a "customer" relationship with a broker or dealer for the purposes of demanding arbitration could not be formed in cases where an investor acted through an

intermediary or agent. But where investors pool their funds and relinquish all investment authority to a third party who deals with an NASD broker, that third-party, not the investors, will normally be the broker's customer.

In light of these principles, Bensadoun's allegations disputing the customer status of all of the Investors other than Schmidt clearly sufficed to raise factual issues requiring resolution by the District Court. Thus far, the Investors have not controverted Bensadoun's allegations with admissible evidence, but on remand will have an opportunity to do so in order to avoid summary judgment in his favor. The circumstances as to Schmidt require further consideration.

The Investors contend that, because Schmidt had a personal account opened through Bensadoun, Schmidt is permitted for that reason alone to demand arbitration as to the present claims. Bensadoun replies that because the claims do not relate to Schmidt's personal account, but to the CFM account, Schmidt cannot demand arbitration. As an initial matter, this seems to present a potential issue of material fact, because the Investors suggest, without directly stating, that the second CFM account and Schmidt's personal account were one and the same. However, if these accounts are separate, Schmidt would be unable to rely on the existence of his personal account to demand arbitration on issues relating to a different account outside the scope of Schmidt's customer relationship with Bensadoun. It would be an odd result if, merely by virtue of holding a personal account, an individual could force a dealer to arbitrate claims as to any other account the dealer has, even if the individual was not the customer for that account. This would open the arbitral forum to pension fund beneficiaries and mutual fund purchasers as long as they had some unrelated account with the broker or at the brokerage firm with which the fund had done business.

Whether Bensadoun intended to deceive the Investors into believing they had accounts with him, whether the Investors actually believed that the funds deposited through Autard would be placed in accounts under their individual control, and whether the second CFM account was Schmidt's personal account are material issues of fact that should be determined by a fact-finder before a final decision on arbitrability is reached.

Conclusion

The judgment of the District Court is vacated, and the case is remanded for further proceedings. Upon remand, the District Court should stay arbitration pending resolution of this lawsuit.