**WALNUT STREET SECURITIES, INC., Petitioner,**

v.

**Bonnie LISK, et al., Respondents.**

**No. 1:06CV1015.**

United States District Court, M.D. North Carolina.

June 22, 2007.

Carrie J. Beehtold, Jeffrey Jamieson, Jeffrey Kalinowski, Blackwell Sanders Peper Martin, LLP, St. Louis, MO, Eric D. Welsh, Parker Poe Adams & Bernstein, Charlotte, NC, for Petitioner.

John S. Chapman, John S. Chapman & Associates, LLC, Cleveland, OH, Andrew O. Whiteman, Hartzell & Whiteman, LLP, Raleigh, NC, for Respondents.

## ORDER

BEATY, District Judge.

On May 10, 2007, the United States Magistrate Judge's Recommendation was filed and notice was served on the parties

pursuant to 28 U.S.C. § 636(b). On May 24, 2007, an Amended Recommendation [Document # 191] was filed to correct a minor clerical error. Plaintiff subsequently filed timely Objections to portions of the Amended Recommendation. The Court has now reviewed *de novo* the Objections and the portions of the Amended Recommendation to which objection was made, and finds that the Objections do not change the substance of the United States Magistrate Judge's ruling. The Magistrate Judge's Amended Recommendation [Document # 191] is therefore affirmed and adopted.

IT IS THEREFORE ORDERED that Walnut Street Securities, Inc.'s Motion to Vacate or Modify the Arbitration Award [Document # 168] is DENIED. IT IS FURTHER ORDERED that Respondents' Motion to Confirm the Arbitration Award [Document # 165] is GRANTED, and the award entered in *Bonnie Lisk, et al. v. Walnut Street Securities, Inc.*, NASD Case No. 95–06350, is CONFIRMED. A Judgment confirming the award and dismissing this action will be filed contemporaneously with this Order.

### RECOMMENDATION OF MAGISTRATE JUDGE ELIASON

ELIASON, United States Magistrate Judge.

Petitioner has filed a motion pursuant to section 10 of the Federal Arbitration Act, 9 U.S.C. § 1, et *seq.*, seeking relief from an arbitration award rendered against it in a National Association of Securities Dealers ("NASD") arbitration. Respondents were the claimants in the case denominated *Lisk, et al., v. Walnut Street Securities*, NASD Case No. 05–06350. Petitioner

seeks to either vacate the award or modify it.

Each side has filed a brief accompanied by evidence and testimony from the arbitration hearing. Respondents have filed a motion to confirm the award (Docket No. 165).[1] Petitioner has supported its position with a second amended motion to vacate (Docket No. 168). In its brief, Petitioner sets out four reasons for vacating the award. It alleges:

1. The Award evidences a manifest disregard of the law in that it was in favor of Respondents where the only basis for Respondents' claim was an alleged violation of an NASD rule that *does not create a private right of action. See Patten v. Signator Ins. Agency, Inc.*, 441 F.3d 230, 235–36 (4th Cir.2006) (describing "manifest disregard" basis for vacatur); *Parsons v. Hornblower & Weeks–Hemphill, Noyes*, 447 F.Supp. 482, 494 (M.D.N.C.1977) *aff'd per curiam*, 571 F.2d 203 (4th Cir.1978).

2. The NASD arbitrators exceeded their powers by issuing the Award against Walnut Street when the subject matter of the dispute—a dispute against an NASD member by individuals who *were never customers* of that member or any of its associated persons—was not eligible for submission to arbitration under the NASD *Code of Arbitration Procedure. See* 9 U.S.C. § 10(a).

3. The Award fails to draw its essence from the NASD *Code of Arbitration Procedure*, which here acts as the agreement to arbitrate, because the Award adjudicates a dispute that is ineligible for arbitration under the NASD *Code of Arbitration Proce-*

---

1. In Respondents' motion, there was a section in which they sought sanctions against Petitioner and/or Petitioner's counsel. During an April 12, 2007 telephonic conference, Respondents withdrew that request.

dure. *See Patten v. Signator Ins. Agency, Inc.*, 441 F.3d 230, 235–36 (4th Cir.2006) (describing failure to "draw its essence" basis for vacatur)

4. Respondents fraudulently invoked the jurisdiction of the NASD by falsely claiming that Respondents were customers of a Walnut Street registered representative, thus procuring the Award by fraud or undue means. *See* 9 U.S.C. § 10(a)(1).

(Docket No. 169, Pet.'s Br. 1–2.)

### Background Discussion

While a more specific discussion of the facts will occur later in this Recommendation, it will be helpful to first set out a broad outline of the facts and the legal position in which this case rests.

Petitioner Walnut Street Securities, Inc. ("Walnut Street") is a broker-dealer based in St. Louis, Missouri, and is a member of the NASD. It serves its customers through a network of registered representatives, one of whom was an individual named Marie Foil. The NASD requires its members to arbitrate some disputes, the parameters of which are set out in the NASD rules.

The Respondents are individuals who purchased unregistered securities of a fraudulent investment called ETS Payphones, Inc. ("ETS"). Petitioner agrees that had the Respondents purchased the securities from Marie Foil, then they clearly would qualify as customers of Walnut Street and could pursue an arbitration claim against it with respect to the sale of these securities. (Docket No. 170, Pet.'s Response 2–3.) Indeed, a number of cases have so held and, therefore, Petitioner's concession is, in fact, mandated. *Washington Square Securities, Inc. v. Aune*, 385 F.3d 432 (4th Cir.2004); *MONY Securities Corp. v. Bornstein*, 390 F.3d 1340 (11th Cir.2004); *California Fina Group, Inc. v. Herrin*, 379 F.3d 311 (5th Cir.2004);

*Vestax Securities Corp. v. McWood*, 280 F.3d 1078 (6th Cir.2002); *John Hancock Life Ins. Co. v. Wilson*, 254 F.3d 48 (2d Cir.2001); *Washington Square Securities, Inc. v. Hicks*, 271 F.Supp.2d 1058 (S.D.Ohio 2003).

Those cases confirm that any dispute over whether the parties have agreed to arbitrate a matter is to be decided by the court and, further, that ambiguities should be resolved by employing a presumption favoring arbitration. *But see California Fina Group*, 379 F.3d at 316 n. 6(presumption only applies to scope of agreement, not the issue of whether an agreement to arbitrate exists). In those cases, the courts examined provisions of the NASD *Code of Arbitration Procedure* and determined that two provisions in NASD Code Rule 10301 were important in deciding whether NASD members have agreed to submit the dispute to arbitration in a situation such as the one presented in this case. One requirement of the rule is that the dispute must be between a customer and a member and/or associated person of the member; and the second is that the dispute must arise in connection with the business of such member or in connection with activities of such associated persons. *Washington Square Securities*, 385 F.3d at 436. With respect to what constitutes the business of a member, the courts held that the term should be construed broadly to cover the requirement that a member supervise its associated persons. *Id.* at 437. Thus, the fact that a customer did not know about the member and only dealt with the associate was not grounds to find that the matter lay outside of the arbitration agreement. *John Hancock Life Insurance*, 254 F.3d at 60. Nor does the dispute fall outside of the NASD arbitration provisions because the product sold by the associate was not sold by the member firm. *California Fina Group*, 379 F.3d at 317–318; *Vestax Securities*, 280 F.3d at

1080; *see also MONY Securities,* 390 F.3d at 1344 (product recommended by agent but order placed through another brokerage firm).

The issue in this case, however, extends one step beyond those presented in the previously cited cases. Here, Petitioner shows that none of the Respondents purchased their securities either from Walnut Street or Marie Foil. Although Ms. Foil had sold these unregistered securities, she did not sell them to the particular Respondents involved in this case. Instead, by the time these people purchased the securities, Ms. Foil had set up a corporation purportedly owned by her and her daughter. The Respondents then purchased the securities from the daughter or persons hired by the corporation. Some of the Respondents, in fact, had never met Marie Foil. Some had only met her in passing, and only one Respondent, Jan Cameron, believed she was dealing with Walnut Street. (*See* Docket No. 170, Pet.'s Response 5–6.) Because of this, Walnut Street contends that none of the Respondents were its customers, or customers of its associate, Marie Foil, and therefore the issue of whether it negligently supervised Marie Foil is not subject to arbitration.

### Discussion

This issue of whether Respondents are customers of Walnut Street and/or its associate, Marie Foil, presents a basic question of whether the parties have agreed to arbitrate the dispute which, as previously indicated, is a question for the court to decide unless the parties have clearly provided otherwise. *Howsam v. Dean Witter Reynolds, Inc.,* 537 U.S. 79, 83–84, 123 S.Ct. 588, 154 L.Ed.2d 491 (2002). Other issues, such as procedural questions, or ones which bear on the final disposition, including allegations of waiver, delay, or like defenses, are for the arbitrators to decide. *Id.*

Two factors distinguish this case from most of the others previously mentioned. First, in this case, the sale was not made directly by an associate of the member firm, but by a non-associate, albeit one who had some connection with the associate. Second, in this case, the parties went through a full arbitration before they called on the Court for intervention. As a result, even though the issue of arbitrability is normally a question to be decided by the court, Respondents claim that Walnut Street has waived the right to have a court decide the issue by failing to object to the arbitrators' jurisdiction and having the arbitrators decide the dispute on the merits. That, in fact, is a major issue in this case.

### IA.

### No Private Right of Action

■ Before deciding the waiver issue, the Court can quickly take care of one of Petitioner's grounds to vacate the arbitration award. Petitioner claims that the award evidences a manifest disregard of the law because the NASD Code does not create a private right of action, *citing Parsons v. Hornblower & Weeks–Hemphill, Noyes,* 447 F.Supp. 482, 494 (M.D.N.C. 1977), *aff'd per curiam,* 571 F.2d 203 (4th Cir.1978). The Court finds this argument to be inapposite to the question at hand. In *Parsons,* the plaintiff sought to establish a cause of action in federal court for violation of NASD rules. The court held that there was no right of a private action "in absence of facts which demonstrate fraud, independently cognizable under the antifraud provisions of the securities laws." *Parsons,* 447 F.Supp. at 494. The rule in question was NASD Rule 1, which required fair practice. The Court did not rule out the possibility that there might be a private cause of action created by NASD rules, but only that the Fair Practice Rule

was so nebulous that it could not be said to have established an independent duty.

In the instant case, Respondents allege that Petitioner is liable based on the failure to supervise its associates. The previously cited court decisions, in fact, found that such a claim created an issue upon which arbitrable liability could be based. Consequently, the Court finds that *Parsons* does not answer the issue before this Court and that the NASD rules relied upon by Respondents in this case can be a basis for failure to supervise liability, which would justify an arbitration award.

### IB.

### *Waiver*

■ Respondents contend that Petitioner voluntarily submitted the issue of the arbitrators' jurisdiction to the arbitration panel. They claim Petitioner never objected to the arbitrators' jurisdiction, expressly or otherwise and, therefore, waived any right to have this Court decide the issue of arbitrability.

Petitioner, on the other hand, responds with a two-prong attack. It claims that the arbitration panel exceeded its authority by ruling on the issue of whether Respondents were Petitioner's customers and second, that they did object to the arbitrators' jurisdiction during the arbitration hearing.

■ The issue of waiver is controlled by the Supreme Court's decision in *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995). There, the petitioner argued that the respondent agreed to let the arbitrators decide the issue of arbitrability by failing to sufficiently object at the appropriate time. The Supreme Court first pointed out that not only was a court, in the first instance, to decide the issue of whether a dispute was arbitrable, but also, in that same category, it was to decide who had the power to decide the issue of arbi-

trability. *Id.* at 943, 115 S.Ct. 1920. In other words, normally the court decides whether an issue should be submitted to arbitration. However, if a dispute arises over whether the parties have agreed that the arbitrators may decide which matters may be submitted to arbitration, then the court will normally also decide that issue. The Supreme Court in *First Options* further held: "When deciding whether the parties agreed to arbitrate a certain matter (including arbitrability), courts generally (though with a qualification we discuss below) should apply ordinary state law principles that govern the formation of contracts." *First Options* at 944, 115 S.Ct. 1920. The qualification was that any finding that the parties agreed to let the arbitrators decide an issue of arbitrability (including the issue of who decides such an issue, the court or the arbitrators) must be supported by clear and unmistakable evidence. *Id.* That is, whereas silence or ambiguity can be used to find that an issue was arbitrable, the opposite is true with respect to any issue over who should decide whether a particular merits issue is arbitrable. Nothing else appearing, the court should presume that without some substantial evidence, silence or ambiguity in the contract should be interpreted to mean that the court, not the arbitrator, will decide whether issues are arbitrable or not. *Id.*

In the case before it, the Supreme Court found that there was no evidence from which to imply that the respondent agreed to have the arbitrators decide which disputes were within the scope of arbitration. The respondents had filed a memorandum with the arbitrators objecting to the arbitrators' jurisdiction. The petitioner claimed that by filing an objection in the arbitration proceeding, instead of obtaining an injunction from a court, the respondents agreed to let the arbitrator decide which issues were arbitrable. The Su-

preme Court disagreed and found that merely arguing arbitrability did not indicate a willingness to let the arbitrators decide that issue. It held that the mere fact that the respondent did not immediately file a motion in federal court to enjoin the arbitration, or to refuse to participate in the arbitration, did not necessarily imply that the respondent had agreed to let the arbitrators decide the issue.[2] *Id.* at 946, 115 S.Ct. 1920.

■ North Carolina law is quite clear with respect to the issue of waiver, and it governs the controversy.[3] In North Carolina, submitting a matter to arbitration and participating in the arbitration hearing without any objection results in a waiver of the right to subsequently challenge the arbitrators making a decision concerning arbitrability, which would normally be reserved for the court. *McNeal v. Black*, 61 N.C.App. 305, 300 S.E.2d 575 (1983). In *McNeal*, the party filed an agreement to arbitrate, answered the claim, and arbitrated, without making any objection to the arbitration. In fact, no objection was made until a month and one-half after the other party moved to have the arbitration award confirmed. The court found that if the defendant had prevailed at the arbitration hearing, it was clear that it would not have been challenging the procedure. It refused to allow a party to participate in an arbitration with an intent to take advantage of a favorable arbitration award and then after receiving an unfavorable ruling, seek to raise objections.

On the other hand, the court did not find waiver in a situation where the plaintiff immediately challenged the existence of the arbitration agreement, and also filed a complaint in state court seeking to determine the existence of an agreement before the tentative hearing date. *Burgess v. Jim Walter Homes, Inc.*, 161 N.C.App. 488, 588 S.E.2d 575 (2003). At no point did the objecting party participate in an arbitration hearing or obtain a decision on the merits. *Id.*

Where the objecting party's actions are less clear, North Carolina requires clear and substantial evidence that the party intended to submit the question of arbitration to the arbitrators before a waiver will be inferred, as mandated by *First Options*, 514 U.S. 938, 115 S.Ct. 1920. Thus, in *Ruffin Woody and Associates, Inc. v. Person County*, 92 N.C.App. 129, 374 S.E.2d 165 (1988), the plaintiff at first agreed that the claims were arbitrable and engaged in the process of selecting the arbitrators. However, at the request of the defendant, the proceedings were postponed. Several months later, the plaintiff filed an amended answer which objected to the arbitrators' jurisdiction. The arbitrators then informed the parties that in spite of that objection, they would decide the issue. At that point, the plaintiff obtained a temporary restraining order in state court. The appellate court found that because the plaintiff's objection was filed before the hearing was commenced, it had properly and timely raised the issue of arbitrability and, therefore, there was no waiver of having the court decide the issue.

■ North Carolina law appears to be consistent with decisions from other states. Thus, in *Moeller v. Cassedy*, 364 F.Supp.2d

---

**2.** In *First Options,* the court of appeals' opinion shows that the party objecting to arbitration in that case refused to sign any submission form. *Kaplan v. First Options of Chicago, Inc.,* 19 F.3d 1503 (3d Cir.1994). In addition, objections were filed challenging the arbitrators' jurisdiction. As noted above, the Supreme Court seemed to suggest that such issues of intent would also be dependent on state law. *First Options,* 514 U.S. at 946, 115 S.Ct. 1920.

**3.** The parties so agreed in a telephone conference.

1340 (N.D.Fla.2005), the court found that by submitting a statement of claim covering the issue to be arbitrated and arguing for the arbitrators to decide the question, the party had implicitly agreed to submit the issue of arbitrability to the arbitrators and waived having the court determine that issue. In *Saneii v. Robards*, 289 F.Supp.2d 855 (W.D.Ky.2003), the court held that when a party objected to arbitration, but was nevertheless compelled to do so by the district court, that party need not continue to raise objections to arbitrability before the arbitrators. Thus, in North Carolina, objections and participation are important factors in determining intent, and any decision on waiver will be highly fact dependent.

In the instant case, Walnut Street relies on three submissions made at arbitration to show that it raised its objection in a timely fashion. First, it cites to its answer. In that answer, Walnut Street generally denies jurisdiction. It also contends that: "Claimants were *never* customers of Walnut Street. These Claimants never transacted any securities business through Walnut Street and never opened any accounts with Walnut Street." (Docket No. 172, Ex. I–C Walnut Street's Answer to Statement of Claim 3.) Next, Walnut Street points to its motion to dismiss and that part of the motion wherein Walnut Street states that Marie Foil had an interest in an outside business entitled Foil & Associates. There, it contends that none of the Respondents alleged they dealt with or purchased securities from Marie Foil, but only through agents of Foil & Associates. It argues that Respondents were attempting to confuse the issue by making it seem as if Marie Foil was somehow involved in the sale of the investment when she clearly was not. It further emphasized that none of the Respondents allege any relationship with Ms. Foil. (*Id.*, Ex. I–D Walnut Street's Motion to Dismiss 3.) Finally, Walnut Street refers the Court to the closing argument at Arbitration Transcript 1201–5. (*Id.*, Ex. II–B–7.) At that point, Walnut Street argued that in order for there to be NASD jurisdiction, NASD Rule 10301(a) requires that the claimant be a customer of the broker-dealer member or of the member's representative. They argue that there was no duty to arbitrate because none of the claimants dealt with Marie Foil. Walnut Street concluded by telling the arbitrators:

> So when you're thinking about what to do, I would ask you again to please apply the law in this case because if this case was in court where it should be because these people aren't customers, the case would be barred by the statute of limitations, in my opinion, and Mr. Chapman would not be able to file a cause of action that is purportedly a violation of NASD rule, and the case would be over. I want to point that out before I went into the merits of the case because you've been asked to do what is fair and what's equitable.

(*Id.*, Ex. II–B–7, Arbitration Tr. at 1204.)

After considering this evidence, the Court finds that Walnut Street did not object, much less timely object, to the arbitrators deciding the issue of arbitrability. Walnut Street signed a Statement of Claim ("SOC") and participated in the arbitration. The answer and the motion to dismiss do not contain any clear objection. Instead, it would appear that Walnut Street merely argued the merits of its claim that the Respondents were not customers of Walnut Street. No issue of jurisdiction is mentioned. These documents actually support the inference that Walnut Street, in fact, submitted the issue of arbitrability to the arbitrators.

In the closing argument, Walnut Street does use the word jurisdiction by pointing out that NASD Rule 10301(a) requires a claimant to be a customer of the dealer-

broker member or such member's representative. However, the mere use of the word jurisdiction in no way implies any objection to the arbitrators deciding the jurisdictional issue. Again, it is consistent with Walnut Street's action in letting the arbitrators decide the issue of arbitrability in the first instance.

North Carolina law requires a timely objection to the arbitrators deciding issues of arbitrability to prevent litigants playing fast and loose with the other party, the arbitrators, and the court. Thus, the farther one goes into the arbitration proceeding without objection, the more one can assume the parties are submitting issues of arbitrability to the arbitrators.

Nothing in the record shows an objection being asserted by Walnut Street to the arbitrators deciding the issue of arbitrability. Instead, the record shows that by its action, Walnut Street clearly submitted the issue of arbitrability to the arbitrators, failed to make any objection to the arbitrators' jurisdiction, and waited until after the arbitration decision to file a motion to vacate the decision in federal court. By so doing, it waived its right to have a court decide the issue of arbitrability.

### IC.

#### Fraud

██ Petitioner claims that the arbitration award was procured by fraud, pursuant to 9 U.S.C. § 10(a)(1), because Respondents falsely claimed that they were the customers of Marie Foil. However, § 10 was designed to encompass fraud based on false facts, not, as here, alleged "deception" arising from expressions of opinion and argument in a complaint or claim. Rather, the Court finds Petitioner's fraud allegations to be relevant, if at all, to whether Petitioner was misled into not making a timely objection to the arbitrators' jurisdiction, primarily because of Pe-

titioner's claims in the SOC and other filings with the arbitrators.

This issue need not detain the Court for long because it is quite clear that from the very beginning, and at least by the time of the motion to dismiss, that Walnut Street knew the claimants did not deal with or purchase securities from Marie Foil. Walnut Street wants the Court to restrict its attention to Petitioner's SOC, where Respondents assert that the claimants were customers of Marie Foil doing business as Foil & Associates and that this statement somehow fraudulently invoked the arbitrators' jurisdiction. But, even accepting Petitioner's construction of the SOC, as noted previously, by the time Walnut Street filed a motion to dismiss, it clearly understood that the claimants did not deal directly with Marie Foil.

Walnut Street cites *Lafarge Conseils Et Etudes, S.A. v. Kaiser Cement & Gypsum Corp.*, 791 F.2d 1334, 1339 (9th Cir.1986), for the proposition that an award may be overturned if it was based on fraud. However, that case involved a claim of false documents, as opposed to the claim of "false argument" which exists here. Moreover, even if actual fraud were involved, Petitioner would have to show by clear and convincing evidence that (1) there was fraud, and (2) it was not discoverable upon exercise of due diligence prior to the arbitration. (*Id.*) In the instant case, at most, it could be said that Respondents did not phrase their claim as Walnut Street would wish it. But by the time the motion to dismiss was filed, it was clear that Respondents asserted that Walnut Street was liable because it had a duty to supervise Marie Foil and that Foil was somehow connected with the sale of securities by Foil & Associates. It was also clear that by the time that Walnut Street filed its motion to dismiss that it understood the true relationship between Foil

and the Respondent purchasers of the unregistered securities. Consequently, not only has Walnut Street failed to establish by clear and convincing evidence that there was fraud in this case, but equally important, Walnut Street knew of the true facts prior to the arbitration. Petitioner has not shown any section 10 fraud.

## II.

### Challenge to the Arbitrators' Decision

■ Walnut Street's last request for review alleges that the award fails to draw its essence from the NASD *Code of Arbitration Procedure* because it adjudicates a dispute which is ineligible for arbitration. The issue before the Court is whether the arbitrators' decision finding Petitioner Walnut Street Securities to be liable for negligent supervision of an associate member was sufficiently supported by the evidence.

■ In the present case, the parties agreed to submit the issue of arbitrability to the arbitrators. Especially where, as here, the arbitrators do not explain their findings and reasoning, the court's review of the facts is limited. *Remmey v. Paine-Webber, Inc.*, 32 F.3d 143 (4th Cir.1994). There, the court stated:

In the Federal Arbitration Act, 9 U.S.C. §§ 1–16, Congress has limited the grounds upon which an arbitral award can be vacated. Namely, a court may vacate an award:

(1) Where the award was procured by corruption, fraud, or undue means.

(2) Where there was evident partiality or corruption in the arbitrators, or either of them.

(3) Where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced.

(4) Where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

*Id.* at 146.

■ In addition to the statutory grounds, or in conjunction with them, a claim may be overturned if it was in "manifest disregard" of the law. *Id.* at 150. *See also Kurke v. Oscar Gruss and Son, Inc.*, 454 F.3d 350, 354 (D.C.Cir.2006). To show manifest disregard, the party challenging the arbitrators' decision must show that the arbitrators were aware of and understood the law, and found it applicable, yet chose to ignore it. *Id.* In all events, the court is not free to overturn the arbitration results simply because it would have reached a different conclusion on those facts. *Remmey,* at 146. Moreover, the court must be cognizant of its duty to discourage arbitration litigation based simply on a party's desire to have a second bite at the apple. *Id.*

In the instant case, Petitioner argues that the arbitrators ignored the law by finding that Respondents were customers of Marie Foil, Walnut Street's associated person, when all of the evidence shows they purchased the unregistered securities from Anne Ballard or other employees of Foil & Associates. At the time Respondents purchased the securities, Foil & Associates was allegedly a corporation owned by Foil and her daughter, Anne Ballard. Apparently, Foil & Associates also had employees who, along with Ballard, sold the securities to Respondents. In fact, the evidence shows that Respondents, except for perhaps Jan Cameron, either did not meet Marie Foil or only met her in passing, and that except possibly for Cameron,

none of them thought they were dealing with Walnut Street.[4]

The Court finds that because Respondents' claim against Walnut Street arises from allegations of lack of supervision, they need not establish that they purchased the unregistered securities directly from Marie Foil. Admittedly, the facts in this case appear to be one of first impression, or at least an extension from those cases previously mentioned where liability has been determined. However, it would appear that negligent supervision under the NASD may arise, even absent direct contact between the associated person and the "customer," should the evidence show that the associated person was sufficiently connected to the fraudulent scheme. In *John Hancock Life Insurance*, 254 F.3d 48, for example, the member firm was held to be liable for the fraudulent sale of promissory notes made not only by an associated person, but also by an associate of that person. Although the precedential value of the opinion is weakened by its failure to discuss the basis for the ruling or the relationship between the associated person and the individual working with him, this case clearly intimates that, in certain instances, no direct relationship is required for liability to attach under the NASD.

To refute this conclusion, Petitioner asserts that the present case is governed by *Bensadoun v. Jobe–Riat*, 316 F.3d 171 (2d Cir.2003). There, the associated person, Bensadoun, received funds from an individual named Autard, who had collected the funds from the defrauded individuals for investment. The individuals were found not to be customers of Bensadoun. Instead, the court found that only Autard was a customer of Bensadoun, and he was only a customer because there was no evidence that Bensadoun was involved in the fraudulent scheme. What is even more significant for our purposes is the *dicta* issued by the court when it said: "If Bensadoun was complicit in a fraudulent scheme that involved misleading the Investors into believing that they were customers of his and Paine Webber's, then the Investors were his customers for the purposes of the NASD code, and Bensadoun must arbitrate." *Id.* at 177. This, however, was not the case and the court found that the investors merely pooled their funds relinquishing all investment authority to Autard. Therefore, they had no connection to Bensadoun.

Petitioner gives a crimped reading to the dicta in *Bensadoun* as limiting liability to that situation where the associated person misleads the investors into believing that they were investing funds with him or the member firm. The Court does not believe that the court in *Bensadoun* intended its dicta to be so limited, but if so, this Court would disagree. Liability of the member firm may be predicated on negligent supervision so long as the associated person is sufficiently complicit in the fraud so as to be merely doing indirectly that which she would otherwise do directly. This would also seem to be the reading given it by the court in *Malak v. Bear Stearns & Co. Inc.*, No. 02 CV 195 RCC, 2004 WL 213014 (S.D.N.Y. Feb.4, 2004). That case was similar to *Bensadoun*, wherein investors relinquished control over investments to a third party, who then dealt with a NASD broker or associated person. In finding that the defrauded individuals were not customers of the associated person, the court found it important (1) that there was no evidence that

---

4. Petitioner contends that Cameron's claim regarding Walnut Street's involvement is not credible. This is based on the fact that in her initial complaints to the FBI concerning her losses, she did not identify Marie Foil or Walnut Street as being in any way responsible for her losses.

the associated person had even communicated with the individual who defrauded the investors, and (2) that the evidence put forth by the investors that the associated person assisted in the perpetration of the fraud was unpersuasive and rebutted.

In contrast to the situation in *Malak*, the facts in the instant case do show that the associated person, Marie Foil, was complicit in the fraudulent scheme. She made at least one sale of the ETS investment herself (albeit not to Respondents) and, in addition, allowed the sale of the securities through her corporation, promoted the sales at program presentations, and profited from the sales by receiving commissions. The evidence of this is substantial, and were the Court itself to entertain the issue of arbitrability, it would be sufficient to find that Respondents were customers of the associated person, Marie Foil, who used Foil & Associates as the vehicle for her scheme. Further, the record discloses evidence that Walnut Street was negligent in supervising Foil, which allowed her to perpetrate the sale of unregistered securities to Respondents.

The evidence before the arbitrators concerning Foil's complicity in the fraudulent scheme is substantial and pervasive.[5] First, she personally sold ETS stock at one time. (Ex. 1.) She also participated in and led seminars in order to market the ETS stock. (Exs. 2 & 15.) The scheme for selling the unregistered securities, at first, apparently involved her as an individual and then through a business entity named Foil & Associates, which allegedly was incorporated some time in 1997. (Ex. 11.) Eventually, Foil decided to run the ETS sales entirely through Foil & Associates and her daughter, Anne Ballard. Ballard then personally, or through employees, sold over $30 million in ETS securities. The commissions were run through

Foil & Associates and Marie Foil received part of those commissions. (Exs. 41 & 47.) In fact, it appears that Marie Foil's income from Foil & Associates and the sale of ETS stock grew substantially with the sales of ETS. Thus, in 1997, she reported $55,721.00 in commissions. In 1998, she reported $326,048.00. In 1999, she reported $615,898.00, and in 2000, $368,670.00. (Ex. 42.)

Marie Foil let Foil & Associates use the same office space and telephone number as she did with her personal sales of securities as an associated person of Walnut Street. (Exs. 8 & 9.) She also ran ads advertising the ETS investment through Foil & Associates. (Exs. 13, 14 & 34.) In fact, some of the ads commingled Foil & Associates and Marie Foil with Anne Ballard and Walnut Street, and indicated that they could sell securities as registered representative(s) of Walnut Street. (Ex. 30.) This commingling occurred in 1998, before the first sale to Respondents, and Walnut Street approved this ad. (*Id.*) Thus, there is substantial evidence that Marie Foil was personally involved in the promotion and sale of ETS stock at one time. Although she ran the sales through her daughter and Foil & Associates by 1997, she always received the associated commissions. Petitioner argues that there is no proof that the commissions which Foil received came from sales of ETS securities to Respondents. This is inaccurate, because the commissions were commingled. Moreover, Foil did more than receive commissions. She was actively involved in the promotion of unregistered securities.

Next, the evidence of Walnut Street's negligent supervision of Marie Foil is likewise substantial and pervasive. The first sale of stock to Respondents apparently occurred some time in 1999 and continued

---

5. The number cited for the following evidence will be the tabbed numbers in Respondents' Outline of Evidence submitted to NASD arbitrators (docket no. 181).

forward. Petitioner attempts to paint a picture that it had no knowledge of Marie Foil's activities as summarized above until after the North Carolina Securities Commission placed a cease and desist order on Anne Ballard, thereby terminating the ETS sales some time in 2000. However, the evidence shows a very lackadaisical approach to supervision and may be summarized by Walnut Street's representatives' own statements that they simply would take the word of Marie Foil when questions arose (Ex. 31), and that so long as she was not personally involved in sales, that is not actually selling the securities, there was nothing Walnut Street could do (Ex. 32). Such an attitude could be viewed as a demonstration of a lack of will to supervise, which the arbitrators apparently concluded to be the case.

Of course, in hindsight, one can always find numerous clues to support a finding of negligent supervision. And, because they are now isolated from the surrounding noise, they appear blatant. Keeping this in mind, the quality and amount of clues still could support a finding of negligent or lack of supervision at the time in question. First, Marie Foil was required every year to list her outside business activities. In 1997, she listed Foil & Associates as an outside activity and listed it both as a corporation and as a sole proprietorship. (Ex. 5.) She did not answer the question of whether it issued securities. Notably, Foil did report that her outside business activity took up thirty-two hours per week and that her sources of income were twenty percent securities and eighty percent insurance commissions. Thus, reading this, one would assume that she spent most of her business hours conducting the business of Foil & Associates and receiving insurance commissions. (Ex. 5.)

However, the next year, in 1998, she listed Foil & Associates to be a partnership and that she spent the vast majority of her time doing the business of Foil & Associates by spending thirty-five hours a week with that business. In addition, her commissions increased to $140,000.00. (Ex. 6.) This substantial increase in income should have generated some interest by Walnut Street. Moreover, she admitted Foil & Associates sold *mutual funds* in addition to annuities and insurance. Yet, there was no investigation. By 1999, Ms. Foil listed Foil & Associates as a corporation that only sold insurance and indicated that she spent forty hours a week doing the business of Foil & Associates earning commissions of $150,000.00. (Ex. 7.) Yet, she reported that for all of her income, seventy-five percent came from securities commissions and only fifteen percent from insurance commissions. This would mean she had securities sales of around $750,000.00, about which Walnut Street surely would have known. The fact that Foil now received seventy-five percent of her income from securities commissions was a complete reversal from the previous years' listing and also should have required an immediate investigation to determine whether Foil & Associates was, in any way, involved in unreported sales of securities. In the year 2000, Foil again identified her outside business activity to be Foil & Associates. Although she then stated she only devoted twelve hours per week to it, she reportedly received more than $50,000.00 in commissions from that business. (Ex. 10.) In listing all sources of income, she then stated that securities commissions constituted ninety percent of the income and insurance commissions only ten percent. Again, this reversal, and the fact she would have had over $450,000.00 in securities sales, certainly should have sparked the interest of the investigator.

In addition, Marie Foil submitted ads indicating that she was commingling the Foil & Associates business with her sales

of securities and indicating Anne Ballard was also aligned with Walnut Street. (Ex. 30.) Walnut Street approved this ad. (*Id.*) More than that, in 1999 and 2000, she also submitted ads with improper information, indicating Foil & Associates was acting as an investment advisor, was promising fourteen percent returns, and listing a non-branch address. (Exs. 33 & 40.) While perhaps insignificant in isolation, the pattern and cumulation of these kinds of problems should have served as a basis for doing more investigation than that which Walnut Street did, which was simply to rely on what Marie Foil told them. (Ex. 11.)

In 1998, Walnut Street had knowledge that Marie Foil could possibly be involved in selling ETS stock. Their investigator, Reid Bradshaw, inconsistently testified that he understood that Anne Ballard was selling ETS stock only as an agent of Foil & Associates, yet at the same time, said that she was only operating as an insurance agent with Marie Foil. (Ex. 27.) In addition, he explicitly stated that when problems came up, he simply took the word of Marie Foil. (Ex. 31.) Walnut Street's supervision apparently consisted of taking Marie Foil's word that she was not improperly selling securities, and that was sufficient for Walnut Street. (Exs. 31 & 32.)

In May 2000, the NASD specifically questioned Walnut Street concerning its supervisory responsibilities with Marie Foil because Anne Ballard stated that Foil & Associates sells mutual funds. (Ex. 37.) During the same time period, Marie Foil herself told Walnut Street that mutual funds may well be sold through Foil & Associates. (Ex. 38.) In that statement, she supposedly warned people who work "in other divisions" that she was the only representative for Walnut Street involved in Foil & Associates and that everything she does has to be approved through Wal-

nut Street. This memo implied that mutual funds could well be sold through Foil & Associates and that, at least in the past, securities may well have been sold by other employees of Foil & Associates. There was no investigation concerning this letter.

Walnut Street's response to this evidence is that none of the Respondents relied on Walnut Street or even on Marie Foil in order to purchase their investments and, therefore, they could not be customers of Marie Foil, much less Walnut Street. Walnut Street states that if Marie Foil had, in fact, sold ETS stock to Respondents, then it could well be held responsible. However, as noted above, direct sales by the associated person is not always required in order to make the respondent a customer of the associated person and, hence, the member firm.

■ Where the associated person actively participates in the investment scheme and, as here, has her minions or employees in her company carry out the effort on her behalf, the sales may be attributed to the associated person so as to establish a customer relationship for the purposes of determining whether the member firm was negligent in supervising the associated person under the NASD Code. The evidence in this case clearly documents Marie Foil's participation in the investment scheme. There is also ample documentation that Walnut Street failed in its duty to supervise its associated person, Marie Foil. Instead, the record shows a situation where Walnut Street was simply content to rely on the first excuse that Marie Foil provided to them despite clear warning signs that she was actually involved in some way in the sale of the ETS stocks, without any follow-up or closer investigation. Moreover, Walnut Street ignored evidence in the outside business reports which, when compared with each other, contained clear warning signs that

something foul was afoot. These reports, combined with a review of Marie Foil's income tax returns, could have rung a warning bell loud enough to wake up the town. (Ex. 42.) But, this was not done. Therefore, on these facts, it cannot be stated that the arbitrators' decision was either in manifest disregard of the law or failed to draw its essence from the NASD Code.

**IT IS THEREFORE RECOMMENDED** that Walnut Street Securities, Inc.'s motion to vacate or modify the arbitration award (docket no. 168) be denied, that Respondents' motion to confirm the arbitration award (docket no. 165) be granted, and that the award entered in *Bonnie Lisk, et al. v. Walnut Street Securities, Inc.*, NASD Case No. 95–06350, be confirmed.

May 10, 2007.